NO. 07-00-0374-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

MAY 29, 2001

_____


LETICIA MARICELA HERNANDEZ, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 287TH DISTRICT COURT OF BAILEY COUNTY;

NO. 1944; HONORABLE GORDON H. GREEN, JUDGE

_____

Before BOYD, C.J., and QUINN and REAVIS, JJ.

In this appeal, appellant Leticia Maricela Hernandez challenges her conviction of capital murder after a jury trial and the resulting punishment of confinement for life in the Institutional Division of the Department of Criminal Justice. For the reasons explicated below, we affirm the judgment of the trial court.

In six issues, appellant alleges (1) the trial court erred in failing to enter written findings of fact and conclusions of law as required by article 38.22 of the Code of Criminal Procedure, (2) the trial court erred in denying her motion to suppress her confession, (3) the evidence is legally insufficient to support the jury's finding that she intentionally or knowingly caused the death of the victim, (4) the evidence is factually insufficient to support the jury's finding that she intentionally or knowingly caused the death of the victim, (5) the evidence is legally insufficient to establish that the burn injuries inflicted by her caused the death of the victim, and (6) the evidence is factually insufficient to establish that the burn injuries inflicted by her caused the death of the victim.

The nature of appellant's challenges requires a detailed recitation of the evidence. On the evening of May 1, 1999, appellant's three-year-old son, Jesus Angel Haro (Jesus), was immersed in scalding water in a bathtub and received second and third degree burns over 45%-50% of his body. Instead of taking Jesus to a local hospital in Muleshoe, appellant and her common law husband, Roberto Contreras, drove Jesus to Juarez, Mexico, where he first received medical treatment at least 12 hours later. Jesus was eventually transferred to a hospital in El Paso and then airlifted to the burn unit at University Medical Center in Lubbock, where he died on May 9, 1999.

In her first issue, appellant claims the trial court was required to enter written findings of fact and conclusions of law concerning the admissibility of her written statement made on May 2-3, 1999, to Detective Joe Zimmerly of the El Paso Police Department. Appellant had filed a motion to suppress all oral and written statements made by her to any

law enforcement officer.  After a pretrial hearing, the trial court denied the motion without further elaboration.  Appellant then filed a motion requesting the trial court to enter written findings of fact and conclusions of law, which the court denied.  She posits that the entry of those findings is mandatory and the appeal should be abated to the trial court.

Section 6 of article 38.22 of the Code of Criminal Procedure provides in relevant part:

> In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause . . . .

Tex. Code Crim. Proc. Ann. art. 38.22 § 6 (Vernon 1979).  It has been held that the requirements of this article are mandatory and the court must file its findings regardless of whether the defendant objects.  *Green v. State,* 906 S.W.2d 937, 939 (Tex.Crim.App. 1995); *Bonham v. State*, 644 S.W.2d 5, 8 (Tex.Crim.App. 1983).  If findings are not made, the proper procedure is to abate the case for the trial court to perform its duty.  *Green,* 906 S.W.2d at 939.

However, it has also been held that findings of fact and conclusions are not required when the statement is not the result of custodial interrogation.  *Chavez v. State,* 6 S.W.3d 56, 64 (Tex.App.–San Antonio 1999, pet. ref'd); *Garza v. State*, 915 S.W.2d 204, 211

3

(Tex.App.--Corpus Christi 1996, pet. ref'd); *White v. State,* 874 S.W.2d 229, 236 (Tex.App. --Houston [14th Dist.] 1994, pet. dism'd); *Inman v. State,* 683 S.W.2d 40, 42 (Tex.App.-- Eastland 1984, no pet.). If an investigation is not at an accusatorial or custodial stage, a person's fifth amendment rights are not yet an issue. *Melton v. State*, 790 S.W.2d 322, 326 (Tex.Crim.App. 1990). Therefore, the appeal must only be abated if we determine that appellant was in custody at the time of her statement.

At the hearing on the motion to suppress, appellant's counsel argued that appellant was only 19 years old with an eighth grade education. When she was picked up by Mexican police, escorted across one of the international bridges at the border and met by members of the El Paso Police Department, she believed that she was under arrest, *i.e.,* that she was in custody at the time she gave her statement. It was also alleged that she was induced to make a statement by promises that she would receive assistance in seeing her children.

A person is in custody only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with an arrest. *Stansbury v. California,* 511 U.S. 318, 322-23, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). There are four general situations which may constitute custody: (1) when the suspect is physically deprived of his freedom of action in a significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to

4

arrest and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt v. State,* 931 S.W.2d 244, 255 (Tex.Crim.App. 1996). The fourth situation does not automatically establish custody, which exists only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

Detective Joe Zimmerly of the El Paso Police Department testified that he first met appellant around 11:00 p.m. on May 2, 1999, after she had cleared immigration at one of the international bridges in El Paso. He and his partner met with her in a side office at the bridge and talked to her for 20 or 30 minutes. He testified that she was not under arrest and was not being detained. He did give her the Miranda warnings "as procedure." He indicated that she signed and initialed a card containing the Miranda warnings, which she received at that time and the card was admitted into evidence. Zimmerly stated he had no problems conversing with appellant in English.

Based on the information that appellant gave to Zimmerly which led him to believe that the incident had taken place in the El Paso area, he drove her to an area where "she stated that she had been at a small town outside of El Paso." Zimmerly testified that he was trying to determine where the incident occurred. While they were driving around, he received a call that an address had been found for appellant, so he drove back to his office. At that time, he administered the Miranda warnings to her again because there were "inconsistencies in her statement," and he wanted to make sure she understood her rights. She initialed the same card again with a new date and time since by then it was

5

after midnight. He then interviewed appellant, which resulted in a statement from her. Zimmerly averred that during the taking of her statement, she was not handcuffed and he offered her a drink and some chips. He stated she was not under arrest. Zimmerly typed the statement signed by appellant and two other persons witnessed it.

On cross-examination, Zimmerly said that the original information about appellant had been provided to the El Paso Police Department through Child Protective Services (CPS) which had been called by the Mexican office that was the equivalent of CPS. Since appellant was apparently claiming that the incident occurred in El Paso, he needed to talk to her to find out where it happened. Prior to meeting with appellant, he attempted to run checks on her and her boyfriend and on the address she had provided, but no record was found. He admitted that he was wearing a gun at the time he met with appellant and that the Mexican police and federal security guards at the bridge were also probably wearing guns. At his first meeting with appellant, she told him that she and her boyfriend had lived in Albuquerque, had come to El Paso, and Jesus had been accidentally burned.

Zimmerly testified he told appellant his office investigated any type of injury to a child, whether it was accidental or intentional, so that documentation could be made as to whether it in fact was accidental or intentional. He told her she was being investigated for the injuries to her child. He said that appellant was cooperative and "freely giving us this information." At the first meeting, she told him that "the child had pooped in his pants, and that she had run the bath to bathe him, [and] that she had left him in the back room." When she returned, she heard him screaming. She said she did not know the water had

6

been so hot and she reached in and pulled him out. Appellant also said this happened in a small town near El Paso. Zimmerly asked her if they drove her along the roads whether she could point out something familiar, and she said yes. At that point, Zimmerly was investigating whether the injury occurred in his jurisdiction. During the drive, he was called and told that the street name appellant had given him for El Paso was actually the street where she lived in Albuquerque. Since appellant had not been totally honest, Zimmerly drove her back to his office to talk to her some more. He did not offer to drive her back to Mexico or to take her anywhere other than the police department.

Once they were back at the police department and appellant had received the Miranda warnings for a second time, Zimmerly told her he knew the address where she said the incident had happened in El Paso was her old address in Albuquerque. At that time, appellant told him "this is what happened," which is how he found out the incident occurred in Muleshoe. Zimmerly never sought an arrest warrant because the offense did not occur in his jurisdiction. He stated appellant was free to leave and that he told her so. Although he did not offer to drive her to Mexico, he testified that "[w]e would have given her a ride." He described appellant as "very cooperative, very calm, very talkative." No handcuffs were placed on appellant until about 7:00 a.m. after the authorities in Muleshoe informed him that an arrest warrant had been issued.

During the time they were in the car, Zimmerly testified that appellant once commented, "I wonder how my Jesus is doing," but did not seem overly concerned because she was very talkative about movies, about being a policeman, and other things.

7

He did not believe she asked about her son during the time he was interviewing her at the police station. Although Zimmerly did not think he specifically stated a purpose for the statement, he asked her if she would like to give a written statement concerning the burning of her son and she said yes. He told her he was going to share that information with CPS. Zimmerly denied he ever told appellant that if she told the truth the way he wanted her to tell it, he would help her see her child.

Appellant testified she met Zimmerly at the immigration facilities. She said she was told by the Mexican police that they were deporting her and she did not go with them voluntarily. The Mexican police never told her she was under arrest, but she presumed she was because it was not her choice to leave Mexico. She did not feel she had the right to walk away from the people at the international bridge or from Zimmerly because they never told her she could. However, she admitted that Zimmerly told her she was not under arrest when she first met him. She did not tell him she wanted to leave because she was scared and thought he was going to help her. She was under the impression that if she helped him, he would assist her to get her children back and she would only have to take some parenting classes. Zimmerly's demeanor changed after they got to his office and he started making accusations against her. He told her it would look better if she voluntarily gave her statement and help show that she was innocent.

Appellant averred she had not slept in several days and had not eaten since the Mexican police bought her a hamburger. She said she signed the Miranda card twice but at the same time. She put different hours on the card because Zimmerly told her to do it

8

since he forgot to read it to her at the immigration office. Appellant believed she signed the card after Zimmerly typed her statement, although she testified it was around 1:30 p.m. which is prior to the 1:36 p.m. commencement date on the written statement. She said she talked to Zimmerly a lot in the car because she was nervous and was trying to be friendly so they would not be strangers to each other. Zimmerly told her he would help her see her children if she gave a statement and would let her be with Jesus at the hospital. Appellant said she repeatedly asked if she could call her sister-in-law to ask how her children were doing and he told her she could after she gave her statement. However, he never told her she could not use the phone until around 5:00 a.m., which was several hours after she had given her statement.

Appellant said she made up what was in her written statement because Zimmerly told her he did not believe what she told him the first time. She said that Zimmerly would tell her something and ask her if it sounded all right and she would say yes because she thought it would help her see her children. However, she admitted that after Zimmerly had typed and printed the statement but before she signed it, he told her it could be used against her at trial. Zimmerly suggested she hand write a statement to the effect that she was sorry for what she had done because it would look good.

The fact that appellant may have been involuntarily deported from Mexico does not affect whether or not appellant was in custody at the time she made any statements to members of the El Paso Police Department. The evidence shows that, prior to talking to appellant, the police did not have probable cause to arrest her. It is also undisputed that

9

appellant was not handcuffed and was told by Zimmerly that she was not under arrest. The giving of the Miranda warnings would seem to reflect cautiousness on the part of the officer rather than an intent to arrest. The fact that appellant was nervous or scared and thought she could help herself by talking to the police does not establish that she was in custody. Furthermore, the fact that the police did not voluntarily offer to drive her somewhere does not indicate she was in custody, particularly since there was no testimony that she ever asked to leave, to be driven to a different location, or to call someone to come get her. The purpose of the interviews was to find out where the incident occurred, since the major inconsistencies noted by police in appellant's story revolved around that issue. Even if Zimmerly did not believe that the burns were the result of an accident prior to appellant giving the written statement at his office, Zimmerly testified that he told her at his office that she was free to leave and she did not contradict that statement. In light of these facts, we do not believe that appellant was in custody at the time she made her statement. Therefore, there is no reason to abate this appeal back to the trial court. Appellant's first issue is overruled.

In her second issue, appellant contends the trial court erred in denying her motion to suppress. The written statement signed by appellant and initialed by her on each page indicates she was warned of her right to counsel, her right to remain silent, her right to an attorney and her right to terminate the interview. The statement also indicates she was not high or drunk, she was not under arrest, she was not handcuffed, and she had been allowed to smoke, drink a Coke and eat potato chips. For the reasons already explicated, we do not believe appellant was in custody at the time of her statement.

10

The trial court did have before it conflicting stories as to whether promises were made to appellant by Zimmerly in exchange for giving her statement to the police. However, the trial court is the sole judge of the credibility of the witnesses at a hearing on a motion to suppress, and the trial court's resolution of inconsistencies between the testimony of two witnesses will not be disturbed absent an abuse of discretion. *Long v. State,* 823 S.W.2d 259, 277 (Tex.Crim.App. 1991), *cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Because there was testimony by Zimmerly that he did not make any promises to appellant, we see no error on the part of the trial court in any finding that the statement was voluntarily given. Appellant's second issue is overruled.

In her third and fourth issues, appellant contends the evidence is legally and factually insufficient to support the verdict that she intentionally or knowingly caused the death of Jesus by his immersion in hot water. Because appellant argues these issues together and both require an extensive review of the evidence, we will also discuss them jointly.

In considering appellant's legal sufficiency challenge, we are required to view the evidence in a light most favorable to the prosecution and then determine if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In considering factual sufficiency challenges, we must view all the evidence without the prism of "in the light most favorable to the prosecution" and we may only set aside the verdict if it is so

11

contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In performing our review, we must remember that the trier of fact is the sole judge of the weight and credibility of the testimony, and we may not substitute our judgment for that of the jury. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App. 1997). We must also bear in mind that a decision is not manifestly unjust because a factfinder has resolved conflicting views of the evidence in favor of the State. *Cain v. State,* 958 S.W.2d 404, 410 (Tex.Crim.App. 1997).

To find appellant guilty of capital murder, the jury had to find that she intentionally and knowingly caused the death of Jesus by immersing him in hot water, causing severe burns to a child under the age of six. The jury was instructed that a person acts intentionally with respect to a result of his conduct "when it is his conscious objective or desire to cause the result." The jury was further instructed that a person acts knowingly with respect to the result of his conduct "when he is aware that his conduct is reasonably certain to cause the result." To sustain a conviction for capital murder, the evidence must show that the accused intentionally or knowingly engaged in the conduct that caused death and intended or knew that death would result from the conduct. *Martinez v. State,* 763 S.W.2d 413, 419 (Tex.Crim.App. 1988). It is the culpable mental state required for a conviction which appellant contends is not supported by the evidence, *i.e.*, there is no evidence or insufficient evidence that appellant intended the death of Jesus.

12

The substance of Zimmerly's testimony during the guilt/innocence phase was the same as at the hearing on the motion to suppress. However, Zimmerly also added he had examined appellant's hands after she told him she reached in and found the water in the bathtub hot, and he did not observe any redness or burning to them. He further stated that appellant did not seem concerned for Jesus.

The written statement given by appellant was admitted into evidence at trial. In that statement, appellant said that she and the man she considers her husband, Roberto Contreras, lived in Muleshoe with her two children, Jesus, who was three, and Natalie De La Luz Acevedo. Around 11:00 p.m. on May 1, 1999, they were at home, and Jesus had an accident in his pants, even though he had been potty trained for over a year. Appellant stated she gets real frustrated with Jesus and only yells at him when she is cleaning him and his pants. After being told by Roberto what Jesus had done, she said she "got mad" and asked Jesus himself what he had done. Jesus began to cry and did not answer. Appellant then picked up a belt and told Jesus if he did not tell her what he had done, she would spank him. He never told her so twice she swung the belt, and each time Jesus turned away and was hit on the middle of the top part of his right leg.

Then, while Jesus was taking off his clothes, appellant went to the bathroom and turned on the hot water and a "little of the cold water." She picked Jesus up under his arms and carried him to the bathtub. The water was filled about halfway and she sat him in there. She felt that the water was hot and turned to get a cup to rinse Jesus off and heard him splashing and screaming. She touched the water and saw that it was really hot

13

and pulled him out with a white towel. She saw that his skin was coming off his legs. She carried him to the living room and he started rolling around and "his whole skin was coming off." Roberto asked her what had happened. She told him and then said they should go to Juarez or the police would arrest them. Roberto called his boss to borrow a truck and she packed. She put some bandages and a "pomada" on Jesus's burns and gave him children's Tylenol. They drove through Clovis, Roswell, Carlsbad, and El Paso to Juarez, where they went to Roberto's sister's house and called a doctor, who could not see them until 11:00 a.m. Jesus was put in a clinic around 12:00 or 12:30 p.m. Appellant then told Roberto to go back home. The police later came to the clinic. Appellant stated that she lied to them and Detective Zimmerly because she was scared and afraid of getting into trouble. At the bottom of her statement, appellant handwrote the following: "I am sorry for what I did to Angel. But I know that I learned my lesson, and I will never do anything like that again."

Nina Guillen testified that she worked at a Town and Country Convenience Store on May 1, 1999. She stated that while she was working a man came in between 8:00 and 9:00 p.m. and said he needed some burn ointment. On cross-examination, she said the man was Hispanic and that he asked for the ointment in Spanish. He told her the type of burn was a hot water burn and that the ointment was for his little boy. The man did not appear agitated, upset or nervous.

Rosa Davis, another employee of the Town and Country Convenience Store, was also working on May 1, 1999. She testified that a man came in the store looking on the

14

medicine aisle for something for a little boy who had gotten burned on the leg. She also stated that the man was not nervous or agitated.

Scott Graves supervised the child abuse unit of the El Paso Police Department. He received a phone call on May 2, 1999, from the Mexican equivalent of CPS about a seriously burned child in Juarez who was not a Mexican citizen. Graves then opened an investigation in his office. He instructed his men to find an address where appellant reported the incident occurred. He later witnessed appellant's signature on the statement she gave to Zimmerly. He also spoke with a CPS caseworker who was going to initiate an investigation. That caseworker came to the station on the evening of May 2. Additionally, he discussed with several people the need to return the child to the United States.

Richard Tirres was employed by CPS in El Paso and was instructed to start an investigation regarding the incident. He contacted the Mexican equivalent of CPS, who told him the mother and child were at a clinic in Juarez. He was also told the child was very sick and could not be treated properly at that clinic. Since the mother stated she was a U.S. citizen, the Mexican authorities were making arrangements to deport her. Tirres then spoke to a doctor at the clinic after which he determined that returning the child to the United States was a priority. Additionally, he spoke to appellant and explained to her that she would be deported to the United States and that he was attempting to have her son returned as well. She told him that she had lived in Colorado, moved to Albuquerque, and from there to El Paso three weeks ago. The child was returned May 3 and initially sent to Thomason Hospital in El Paso for a few hours and then airlifted to the burn center in

15

Lubbock. Tirres also visited with appellant at the police station after she had given a statement to Zimmerly.

Dr. Alan Tyroch was the director of trauma and surgical critical at Thomason Hospital in El Paso. He was the treating physician for Jesus. He stated Jesus sustained second and third degree burns to 45% of his body. The child had cellulitis, which is a soft tissue infection around the burns. He stated that the most important thing in the initial management of a burn patient is to rehydrate the patient. In major burns, the body's immune system is increased to a higher level and sometimes the major organs start working at a lower rate and can shut down. That situation can occur in someone with 45% second and third degree burns. Dr. Tyroch was concerned that Jesus's urinary output was not adequate, which could have meant he was going into renal failure. Tyroch said it appeared Jesus had received fluid resuscitation and topical treatment for his burns in Mexico. He saw Jesus for only two hours before he was transferred to Lubbock.

Dr. Hector Castro was a plastic surgeon in Ciudad Juarez, Chihuahua, Mexico, who was asked to provide a second opinion to the doctor at the clinic where Jesus was taken in Mexico. He believed that Jesus had burns over 52%-55% of his body. He also noticed bruises on Jesus's legs where it looked like he had been hit or beaten with a belt. Dr. Castro said that Jesus was very dehydrated. He told the doctor at the clinic to use a certain solution to replace the fluids. Dr. Castro also said the child should be given antibiotics to prevent infection. He felt it would be more appropriate for the child to be treated at a burn center. He also reported to the authorities that he thought the child had

16

been mistreated. He thought the child had a bad prognosis because he was not treated immediately.

On cross-examination, Dr. Castro stated that the discharge of urine was very limited compared to what it should have been. He also testified he believed the child should have received glucose solution to prevent shock immediately after he was burned and that the child should have gone into a burn unit to be scraped immediately to remove the burned skin so a skin graft could be done as soon as possible. Dr. Castro averred that Jesus's mother told him that her boyfriend had caused the problems. He also averred that when he saw the child for the first time, his impression was that if the child got proper treatment immediately, he would heal.

Rodney Stevens was a Muleshoe police officer. On May 3, 1999, he was asked to investigate the injury to Jesus. Initially, he went to the house in Muleshoe and stayed at the location to secure the residence. He also took part in searching the house with other officers. They found several pieces of skin on the floor. Additionally, they tested the temperature of the water from the kitchen faucet which was 144 degrees. They also found a pair of underwear at the sliding glass door on the back porch. He said the house is located two and one-half blocks from a hospital.

Sergeant Joe Orozco, of the Muleshoe Police Department, was notified on May 3, 1999, that there was a situation of a small child being burned in a tub. He and another officer obtained a search warrant and located and searched the truck that Roberto had borrowed. They found suspected skin in the truck. They then went to the residence where

17

they located Contreras and place him under arrest. On cross-examination, Orozco stated he made no visual inspection of Contreras's hands.

Contreras testified that, on the evening of May 1, he had three beers, but appellant did not have any, as they watched television. Roberto got up to go outside to smoke when he discovered that Jesus had gone to the bathroom in his pants. He said Jesus had been potty trained but recently had some problems. They would reprimand Jesus when he had an accident. Roberto testified he spanked Jesus that day for his accident, and told appellant what had happened. When he was out at the car, he heard Jesus crying, so he entered the house and found appellant in the bathroom with Jesus in her arms. Some of Jesus's skin came off. Roberto went to the store to look for ointment between eight and nine o'clock. They were afraid to get treatment in Muleshoe because appellant's mother had wanted to take Jesus away from them on other occasions. Roberto said it was appellant's decision to go to Juarez. He did not realize Jesus was hurt badly because he was talking and eating. They borrowed a pickup and arrived in Juarez around 6:00 a.m. and went to his sister's home. He felt he could have overruled appellant's decision to go to Mexico, but did not do so.

On cross-examination, Roberto admitted he pled guilty to voluntary manslaughter. Roberto spent a half day in Mexico and then drove back to Muleshoe. Roberto said that when he hit Jesus with a belt, he hit him on the legs and caused some marks. He was the one who took Jesus's dirty underwear outside. He also said he was not mad but bothered by Jesus's behavior. It was not the first time that Roberto had hit Jesus with a belt, and in

18

fact he had hit him before for having an accident in his pants.  However, he said that appellant was the one who put the child in the bathtub.  Roberto read two letters he wrote in which he stated that what happened to Jesus was an accident.  He also admitted he had not actually seen appellant put the child in the water since he went outside.  He said that appellant put ointment on the burns and got the child something to eat and drink.  Roberto averred that he was the one who would hit the child with the belt, not appellant.

David Young, employed by the Texas Department of Public Safety crime laboratory in Lubbock, was requested to process the house where appellant lived.  While doing so, he collected several pieces of skin.  He compared two of the pieces of skin to a blood sample from Jesus and concluded that the skin came from Jesus.  On cross-examination, Young stated that he did not take any samples of anything from the bathroom.  He neither saw anything he could collect from the bathtub nor found any skin or blood on the floor in front of the tub.

Maria Fredlund, who works for CPS, testified that she visited Jesus in the hospital in the burn unit.  She identified pictures taken on May 4, 1999, of Jesus and the burns on his body which were admitted into evidence.  She said he did not appear to be in a lot of pain and conversed with her primarily in English.

Dr. Michael O'Neill practiced emergency pediatric medicine at the University Medical Center in Lubbock.  He was part of the evaluation team when Jesus first arrived at the hospital.  His observations were that the child was highly anxious and in pain.  However, Jesus's airway and breathing were intact, as well as his circulatory system.  He also had

significant third degree burns which were several days old. Dr. O'Neill believed the burns covered 45% to 50% of the child's body. He felt the temperature of the water had to be 135 to 140 degrees to cause those types of burns. Because the child seemed to be in overall good health with no other complicating factors at that point, he felt the child might have had a good prognosis "although third degree burns do have some mortality associated with them no matter what the age." Death can occur from dehydration or secondary infection. Signs of dehydration include decreased urine output and increased blood pressure. If dehydration becomes severe, the blood pressure can fall and death could occur from organ failure.

Dr. O'Neill saw no signs of secondary infection when he examined Jesus, although he stated that almost every burn surface eventually becomes contaminated with bacteria. He said that Jesus needed to be in a burn center. If Jesus had received immediate medical attention, he would have avoided stressors by receiving fluids and pain medication. A delay in treatment would create a substantial risk to the person. Dr. O'Neill testified that this was one of the worst cases he had seen in the emergency room. He also said it is not unusual to see burn patients in the emergency room with some type of ointment put on them. Although he did not note any indications of infection, he stated there were other things the burn team may have done to make those assessments. Dr. O'Neill examined the photographs of Jesus and noted a burn behind the left ear, which was not an immersion burn. There was also a burn on his upper back which was not an immersion burn. He said that if a person is forced into water, he will have burns on both feet, both legs, and the buttocks, and may also get some splash burns. Dr. O'Neill stated

20

the water temperature in a house should be kept below 120 degrees and that burns would occur fairly quickly at 144 degrees.

Chief of the Muleshoe Police Department, Don Carter, received information around 2:00 a.m. on May 3, 1999, that a child had been burned at a house in Muleshoe. His office verified the address and then searched for the vehicle that Contreras had been driving. Later, they got a warrant to search the house and for the arrest of Roberto. They also made arrangements to have the crime scene processed. Chief Carter said it would take around 45 minutes to an hour to travel to Lubbock by car. He also said they found a belt in the house close to the description that was given to them. He did not know if Roberto had bathed in the tub since he returned to Muleshoe or had disposed of any wash rags or towels.

Dr. Sammy Deeb was one of three attending physicians for burn patients at University Medical Center in Lubbock, and he was the admitting physician for Jesus on May 4. He said Jesus had "pretty extensive second and third degree burns from the waist down." Those injuries were consistent with immersion burns. Jesus was also behind on his IV fluid. Dr. Deeb believes that it is critical that fluid replacement take place immediately because if there is not adequate resuscitation for good blood flow to the skin, the injury gets worse. Jesus appeared to be dry mouthed and his skin was not as taut as it should be. He also expected to see some mental status change, but was surprised that Jesus was talking. There were mostly third degree burns over 45% to 50% of his body.

21

As soon as they got Jesus stabilized and resuscitated, he had a gastrointestinal bleed. His blood pressure also decreased, he threw up, and went into cardiac arrest three times before he died. GI bleeding is caused when the blood flow to the bowel has suffered due to lack of fluid, so when the blood flow is reestablished, the blood vessels rupture. Jesus also appeared to be septic in his last days and was having breathing problems. All of these things indicated that Jesus's body was not able to respond to the injuries received from the burns.

Dr. Deeb averred that he did not believe the resuscitation received in the first few days of treatment was timely. If the body does not receive resuscitation within the first two or three hours, it will suffer "tremendous consequences." He stated the mortality rate would increase tremendously if the child had gone 12 hours before receiving treatment. He did not know of a single doctor who would not immediately send a patient like Jesus to a burn center. Dr. Deeb stated that Jesus's burns indicated a "classic submersion picture," and the burns on his back could be splash burns. He also said that it would be very hard to get either a splash or submersion burn behind the ear. Most household water heaters should be set at 120 or 125 degrees.

Dr. Mark Krouse, the Deputy Chief Medical Examiner in Fort Worth, performed the autopsy on Jesus. He found thermal burns on the back, buttocks, and upper and lower extremities consistent with hot fluid immersion with burn injuries consistent with partial immersion and splashing of hot liquid on the left arm, the upper back, the front of the torso, the abdomen and chest, and the face. There were also contusions on the legs. The child

22

died in a state of cardiovascular collapse with dilation of small blood vessels throughout all major organs, fluid in his lungs, cerebral edema, and pulmonary infection. There was fatty metamorphosis of the liver; evidence of kidney failure; mononuclear infiltration of the heart, adrenal glands, and brain due to loss of water, proteins, electrolytes and salt; and bone marrow failure. In his opinion, death was due to complications of thermal burns due to immersion and said if the water temperature was 140 degrees, it would take no more than five to ten seconds of immersion to receive almost full thickness burns.

However, Dr. Krouse opined that far more often than not, a child of that age with that degree and extent of burns should survive. The most critical treatment is replacement of lost circulating blood volume by massive IV treatment, and the next treatment is to fight infection. He said Jesus suffered from multiple organ failure. Modern medical treatment within a reasonable period of time should have made the burns survivable. It was a bad burn in terms of the amount of surface area involved by significant partial thickness burning and it had gone for a significant period of time without treatment.

Appellant called two witnesses as part of her defense. The first was Lisa DeHoyos, a former critical care nurse who was currently working as a legal nurse consultant. She reviewed some of the medical records for Jesus from Mexico, the records from El Paso, and the records from the University Medical Center in Lubbock to ascertain if the child received appropriate medical treatment for his injuries. She noted records from May 4 which indicated that the child's skin was swollen and tight, which does not allow for adequate circulation and may cause tissue death. On May 5, Jesus was having some

23

bleeding from his intestine, but she found nothing in the records indicating that the cause of the bleeding was ever determined. A chest x-ray was ordered that morning to rule out injuries from trauma, but it was later cancelled. No x-ray was performed until the child quit breathing on May 8, just hours before his death. An x-ray would have permitted an assessment of the patient's fluid status and the presence of pneumonia or abnormal conditions. DeHoyos said there were indications of fluid overload in the treatment. At 10:00 a.m. on May 7, tube feedings were increased and IV fluids were changed to one with more potassium.

On May 6 at 1:30 a.m., the records reveal that someone approved using the current lab results as that day's morning lab work. However, in DeHoyos's experience, lab samples should be checked frequently to make sure the fluid and electrolyte balances are within normal limits. The last lab results had been ordered around midnight. Those results showed low potassium levels. She did not find it acceptable to use noncurrent lab results to monitor a low potassium level. On May 8, a blood-gas analysis showed a decreasing level of potassium to a dangerously low level. However, more potassium had been ordered on May 7 for the IV fluid than was ordered on May 8. A few hours before Jesus died, a massive dose of potassium was ordered. A 7:30 a.m. order on May 7 required that blood gasses be done, but apparently were not done and were reordered at 2:00 p.m. A later blood gas at 7:50 p.m. showed a decreasing oxygen level, but no orders were given for oxygen at that time.

24

DeHoyos further averred the nurse's notes indicate that on May 7 at 6:00 p.m., Jesus's speech was slurred and he was confused, which was about the same time the oxygen level was dropping. After the May 7 report, the next test for oxygen levels was done on May 8 at 9:45 p.m., which was well over 24 hours after the previous one and not until after Jesus had quit breathing. There was also an indication as early as May 6 that the child was having breathing problems, but no chest x-rays or blood gas analyses were ordered that day. The records for May 6 indicated a somewhat low blood pressure and an elevated heart rate. On May 7, the surgery service was called for a very low blood pressure. On May 8, the reports show that Jesus did not have enough oxygen, had a low blood pressure and a high heart rate. The physician did not address those concerns. If the blood pressure is not kept high enough to keep blood flowing to the major body organs, they begin to fail from lack of oxygen supply. The test levels for May 8 at 6:30 a.m. did not indicate that Jesus was stable, even though the physician wrote that he was. By 7:00 p.m. on May 8, Jesus went into cardiac arrest, the cause of which was most likely aspiration of tube feedings into his lungs.

On May 8 at 11:30 p.m., a pediatric specialist indicated Jesus had acute cardiac arrest likely secondary to sepsis, low potassium, bleeding disorder, possible aspiration, and central nervous system dysfunction. DeHoyos testified that, from the records, the low potassium began around May 6, the bleeding disorder around May 6 or 7, breathing problems on May 6 and central nervous system problems on May 7. There were no medications ordered to treat the low blood pressure, oxygen was not provided until he went into cardiac arrest, and potassium administered to Jesus was being decreased. Cultures

25

of his burn wounds indicated that staph and strep bacteria were noted on May 6, but Jesus was given no antibiotics until six hours before his death. On May 8, a series of phone calls were made to physicians by nurses regarding the low blood pressure. Other than intermittent fluids and some albumin, which he had already been receiving, nothing was prescribed for that condition. In spite of consecutive low readings and numerous phone calls, the physicians did not respond.

On May 6, the nurse called twice requesting permission to decrease the fluid because she believed he was getting too much, and the doctor denied the request. DeHoyos said that too much fluid can back up causing an inability to breathe correctly. The records do not show Jesus's head was elevated to prevent the tube feedings from backing up and causing aspiration into the lungs. On May 7, the nurse noted five hours worth of feeding in the stomach. In most situations, the feedings would stop if there was two hours worth of feeding in the stomach because it is not being digested properly. Jesus's feedings were not stopped. If Jesus could not turn and have it come out of his mouth, he could aspirate the fluid and he was on his back with his hands tied.

Dr. Lloyd White, the Nueces County Medical Examiner, reviewed Jesus's medical records, the autopsy report and microscopic slides obtained at that autopsy, and statements from law enforcement officers and appellant. He averred that nowhere in the records was there any determination that the injuries would be fatal and there was anticipation that Jesus would survive and be discharged. His death was caused by fluids leaking into his lungs resulting in an injury to the lungs and, due to lack of oxygen during

26

cardiac arrest, the organs were damaged. The burns themselves were not fatal. However, a complication in Jesus's treatment triggered a change in his prognosis, which led to death. Loss of fluids can cause multiple organ failure and replacement of fluids should start as soon as possible. Nevertheless, the medical records indicate that from the outset the burns were resolving. The shock and multiple organ failure occurred following the cardiac arrest resulting from the aspiration.

An accused's culpable state of mind is almost invariably proven by circumstantial evidence. *Morales v. State,* 828 S.W.2d 261, 263 (Tex.App.--Amarillo 1992), *aff'd,* 853 S.W.2d 583 (Tex.Crim.App. 1993). Mental state may be inferred from words, acts and conduct, *Dues v. State*, 634 S.W.2d 304, 305 (Tex.Crim.App. 1982), or the surrounding circumstances. *Ledesma v. State,* 677 S.W.2d 529, 531 (Tex.Crim.App. 1984). The jury is the sole judge of the weight of the evidence and the credibility of witnesses, and it may believe or disbelieve all or part of any testimony. *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Crim.App. 1984). Moreover, intent to kill may be inferred from the use of a deadly weapon. *Godsey v. State*, 719 S.W.2d 578, 580 (Tex.Crim.App. 1986); *Childs v. State*, 21 S.W.3d 631, 635 (Tex.App.--Houston [14[th] Dist.] 2000, pet. ref'd). A deadly weapon is defined to be "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Pen. Code Ann. § 1.07(a)(17)(B) (Vernon 1994). Hot water has been used as a deadly weapon. *See Gilbert v. State*, 769 S.W.2d 535, 536-37 (Tex.Crim.App. 1989). Flight is also a circumstance from which an inference as to culpable

mental state may be drawn. *See Johnson v. State,* 915 S.W.2d 653, 659 (Tex.App.-- Houston [14th Dist.] 1996, pet ref'd).

The evidence in the light most favorable to the prosecution shows that appellant was angry at Jesus for having an accident in his underwear, beat him with a belt, knew the water was hot, the burns were consistent with the child being lifted into the bathtub, the water in the house was 144 degrees, which is higher than recommended settings, allegedly reached in the tub after hearing Jesus scream to discover the water was very hot but there was no sign of redness or burns to her hands, delayed extraction of Jesus from the scalding water by reaching for a towel before pulling him out, delayed medical treatment for at least 12 hours, even though she knew his skin was coming off, fled the country with Jesus because she was afraid of what the authorities would do, lied to the authorities about where the incident occurred, seemed calm and unconcerned about Jesus, and wrote a statement saying she was sorry for what she did to Jesus and had learned her lesson, indicating that the event was not accidental. Even if appellant did extract Jesus from the scalding water prior to his demise, applied some ointment to his burns, and eventually sought medical treatment for the injuries, those facts could have been seen as an attempt to cover up her prior actions. Although there is conflicting evidence as to whether the incident was accidental or, even if not accidental, whether appellant intended death to result from her conduct, those conflicts are to be resolved by the jury. We believe that, from a totality of the circumstances surrounding the incident and appellant's conduct, a rational trier of fact could have found the required mental state beyond a reasonable doubt. Furthermore, we may only find the evidence factually insufficient if the finding is manifestly

28

unjust, and we cannot say that the verdict based on all the evidence before the jury is so against the overwhelming weight of the evidence as to satisfy that standard. Appellant's third and fourth issues are overruled.

In her fifth and sixth issues, appellant argues that the evidence is legally and factually insufficient to sustain the verdict that the burn injuries allegedly inflicted by her caused the death of her son. Appellant contends there is ample evidence that the prognosis for the child was good when he was presented for treatment at each medical facility and that death resulted from the gross neglect and improper treatment by medical personnel after Jesus was removed from her care. Appellant posits that her conduct was insufficient to cause Jesus's death, but the "failure to monitor the child's blood pressure and fluid levels, the failure to monitor electrolyte levels and potassium levels, the failure to properly position the child in his hospital bed and monitor his tube feeding, and the failure to properly address the infectious condition of the child" all led to his demise.

Where a wound causes a disease which produces death, the death is attributable to the wound if there is no evidence of gross neglect or improper treatment. *Turner v. State*, 505 S.W.2d 558, 560 (Tex.Crim.App. 1974). There is evidence from which the jury could have found that complications from the burns themselves and/or the delay in medical treatment for the child resulted in his death. There was testimony from multiple doctors that the most important treatment is fluid hydration as soon as possible after the injury and failure to receive such treatment can worsen the prognosis or increase the mortality rate. The testimony was also consistent that a person with the type of burns suffered by Jesus

29

should be treated in a burn unit. Additionally, there was testimony from Dr. Tyroch in El Paso that he observed signs of possible infection and renal failure prior to Jesus's transfer to University Medical Center. Even appellant's own witness, Dr. White, did not testify that the treatment Jesus received was improper or negligent, only that he died from complications resulting from that treatment, which would not have been necessary without the existence of the burns. The only person to question the treatment received at University Medical Center was a nurse who the jury could have found was not qualified to make such a judgment.

It is also appellant's position that delay in treatment was attributable to Mexican and Texas authorities who delayed the child's transport to the United States. There is no evidence that either Texas or Mexican authorities unnecessarily delayed the return of Jesus to the United States. If appellant had not fled the country with her child bypassing medical treatment in Muleshoe and several other cities, there would have been no need for any administrative action to return her child to this country for treatment.

The jury was instructed that ". . . you cannot find the defendant, LETICIA MARICELA HERNANDEZ, guilty unless you believe beyond a reasonable doubt that the death of Jesus Angel Haro would not have occured [sic] but for the conduct of the defendant; so that if you believe the conduct of a third party was a concurrent cause sufficient to cause the death of Jesus Angel Haro and the conduct of the defendant was clearly insufficient, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict 'Not Guilty.'" The evidence viewed in the light most favorable to

30

the prosecution could lead a rational trier of fact to find that the death of Jesus was caused by appellant and that finding is not so against the overwhelming weight of the evidence as to require reversal.  Appellant's fifth and sixth issues are overruled.

In summary, we overrule all of appellant's issues and, accordingly, affirm the judgment of the trial court.

John T. Boyd
Chief Justice

Do not publish.

Quinn, J., dissents.

31