COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.  2-03-472-CR

 

 

SHARAN ANN WILLIAMS                                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

             FROM THE 78TH
DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                         INTRODUCTION








Ujeana
and Precious Williams, aged seven and eight, died in a fire in the early
morning hours of October 5, 2002.  A
jury convicted their mother, Appellant Sharan Ann Williams, of two counts of
reckless injury to a child resulting in serious bodily injury.  In two issues on appeal Appellant contends
that the evidence is legally and factually insufficient to support her
conviction.  After careful review of all
of the evidence under the applicable standards of review, we affirm.

BACKGROUND
FACTS

At
the time of the fire, the girls were spending the night in a structure behind
an empty house at 814 Dallas Street in Wichita Falls. Appellant=s boyfriend, Herbert Ronald
Bowden, was living in the structure temporarily, with permission of the owner,
until he could save money for an apartment. 
The structure was a former duplex, the back part of which had been
removed and the back door boarded up. 
It had no kitchen, bathroom, or utilities.  It had not been lived in for some time. 

The
girls had lived with their grandmother, Zula Mae Scott, in her home on Jalonick
Street, since they were babies.  On the
evening of October 4, 2002, Appellant and Bowden took the children from Zula
Mae=s house at approximately 5:30
p.m., and walked to the structure where Bowden was staying a few blocks
away.  Appellant left them with Bowden
at approximately 6:30 p.m., first to go to a convenience store for cigarettes,
then again at about 8:30 p.m. to go out. 
Bowden agreed to stay with the girls while she was gone. 








Before
Appellant left the second time, the girls were put to bed in a back room of the
structure, with a candle burning in an aluminum pie plate on the floor, for
light.  Bowden checked on the sleeping
girls during the evening but left the candle burning, and, according to his
statements after the occurrence, fell asleep on a couch in the front room
adjacent to the bedroom sometime after 11:00 p.m.  He awoke sometime after 1:00 a.m., heard screams, and discovered
that the room where the girls had been sleeping was engulfed in flames and
smoke.  Bowden tried but was unable to
enter the room to rescue the girls because of the intense flames and heat, and
the fire was too far advanced to enter the structure at all by the time the
fire department responded.  Appellant
arrived back at the scene as the fire department was extinguishing the
blaze.  








Bowden
and Appellant were each charged with two counts of reckless injury to a child,
and their cases were consolidated for trial. 
The jury convicted Bowden on both counts of recklessly causing serious
bodily injury to each child Aby leaving [them] in a room without adult supervision with a candle
burning.@ He was sentenced to ten years= confinement on each count to run
concurrently, based upon the jury=s assessment.[1] 
Appellant was convicted by the jury on both counts of recklessly causing
serious bodily injury to the children by Ataking [them] from a house with working utilities to a
building where there were no working utilities and leaving [them] in [a] room
in that building and leaving a lit candle in the room or by leaving [them] to
sleep in the room in the said building without utilities with a burning candle
instead of taking [them] to a house with working utilities.@ 
The trial court sentenced her to fifteen years= confinement on each count to run
concurrently in accordance with the jury=s verdict on punishment. 

                                          ELEMENTS
OF OFFENSE








The
critical inquiry in reviewing both legal and factual evidentiary sufficiency is
whether any rational trier of fact would have been justified in finding the
essential elements of the offense beyond a reasonable doubt.  McDuff v. State, 939 S.W.2d 607, 613
(Tex. Crim. App.), cert. denied, 522 U.S. 844, 118 S. Ct. 125 (1997); Johnson
v. State, 121 S.W.3d 133, 135 (Tex. App.CFort Worth 2003, pet. ref=d).  We
measure sufficiency of the evidence by the elements of the offense as defined
by the hypothetically correct jury charge for the case.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Ortiz v. State, 993 S.W.2d 892, 895 (Tex. App.CFort Worth 1999, no pet.).  Such a charge is one that accurately sets
out the law, is authorized by the indictment, does not unnecessarily restrict
the State=s theories of liability, and
adequately describes the particular offense for which the defendant was tried.  Gollihar v. State, 46 S.W.3d 243, 253
(Tex. Crim. App. 2001); Malik, 953 S.W.2d at 240.  The law as authorized by the indictment
means the statutory elements of the charged offense as modified by the charging
instrument.  Curry v. State, 30
S.W.3d 394, 404 (Tex. Crim. App. 2000).  


The
statute defining the offense of injury to a child under which Appellant was
charged provides;

A
person commits an offense if he intentionally, knowingly, recklessly, or with
criminal negligence, by act or intentionally, recklessly by omission, causes to
a child, elderly individual or disabled individual:

 

(1)
serious bodily injury.

 

Tex. Penal Code Ann. ' 22.04(a)(1) (Vernon 2003).

Injury
to a child is a result-oriented offense requiring a mental state that relates
not to the charged conduct but to the result of the conduct.  See Alvarado v. State, 704
S.W.2d 36, 38 (Tex. Crim. App. 1985). 
It is not enough for the State to prove that the defendant engaged in
the alleged conduct with the requisite criminal intent; the State must also
prove that the defendant caused the result with the requisite criminal
intent.  Lee v. State, 21 S.W.3d
532, 540 (Tex. App.CTyler 2000, pet. ref=d) (citing Cook v. State,
884 S.W.2d 485, 490 (Tex. Crim. App. 1994)). 









Persons act Arecklessly@ with respect to the result of
their conduct when they are aware of, but consciously disregard, a substantial
and unjustifiable risk that the result will occur.  Tex. Penal Code Ann.
' 6.03(c) (Vernon 2003).  The risk must be of such a nature and degree
that its disregard constitutes a gross deviation from the standard of care that
an ordinary person would exercise under all the circumstances as viewed from
the actor=s standpoint.  Id. 
Reckless conduct involves conscious risk creation; that is, the actor
was aware of the risk surrounding his conduct or the result of his conduct, but
consciously disregarded that risk.  See
Montoya v. State, 744 S.W.2d 15, 29 (Tex. Crim. App. 1987), cert. denied,
487 U.S. 1227 (1988); Lewis v. State, 529 S.W.2d 550, 553 (Tex. Crim.
App. 1975).   

Proof of a culpable mental state
may be and is most often proven through circumstantial evidence.  Lee, 21 S.W.3d at 539; Morales v.
State, 828 S.W.2d 261, 263 (Tex. App.CAmarillo 1992), aff=d, 853 S.W.2d 583 (Tex. Crim. App.
1993); see Dillon v. State, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel
Op.] 1978).  Ordinarily the culpable
mental state must be inferred from the acts of the accused or the surrounding
circumstances, which include not only acts, but words and conduct.  Ledesma v. State, 677 S.W.2d 529, 531
(Tex. Crim. App. 1984); Morales, 828 S.W.2d at 263.   








Additionally, the State must prove causation, that is, that
the person both had the requisite mental state and recklessly caused serious
bodily injury to the child by the conduct charged.  See Tex. Penal Code
Ann. ' 22.04(a)(1).  A person is criminally responsible if the
result would not have occurred but for his conduct, operating either alone or
concurrently with another cause, unless the concurrent cause was clearly
sufficient to produce the result and the conduct of the actor clearly
insufficient.  Tex. Penal Code Ann. ' 6.04(a) (Vernon 2003).

                                            REVIEW
OF EVIDENCE

Zula
Mae Scott, the girls= grandmother, testified that the
two girls had lived with her since they were babies.[2]  Appellant had recently started helping to
watch the children and sometimes stayed at Zula Mae=s house with them but was mostly Ain and out.@ 
Appellant had a key to Zula Mae=s house.  Zula Mae=s house had beds, electricity, a
refrigerator, toilet, and gas. 








Zula
Mae learned from the girls that Appellant and Bowden had been taking them to
spend the night at a Avacant@ building.  She was concerned about the lack of
electricity, she said, and talked to Appellant and Bowden about the danger of
fire.  Zula Mae testified she had told
both Appellant and Bowden about two weeks before the fire that Ait was too dangerous to be taking
them down there and burning candles.@  According to Zula
Mae, Appellant said she always made sure to put the candles out before she went
to sleep, and Zula Mae believed that if Appellant had been in the house that
night, she would have done so.

Zula
Mae testified that, on the evening of October 4, Appellant was supposed to stay
with the girls at Zula Mae=s house until she got home from work. 
They had discussed the day before that Appellant was to come stay with
the girls.  However, neither the girls
nor Appellant were home when Zula Mae came home at 5:30.  She waited for Appellant to bring the girls
home until she got a call that there had been a fire and the girls were dead.  

Charles
Williams testified he met Appellant when they were growing up in the Projects,
and they had one son and the two girls together.[3]  Their son, aged 13, lives with him.  Williams had known Bowden for a number of
years and had worked with him; he knew Bowden was hanging around with Appellant
but did not know about the abandoned house until the fire. 








Williams testified that he saw the
girls about every other weekend and was planning to take them to Waxahachie on
the evening of October 4, 2002, for the weekend to visit family.  After he got off work on the afternoon of
October 4, he called Zula Mae, but she told him the girls were not there, so he
decided to wait to pick them up until the next morning.  At about 6:30 p.m., 

he saw Appellant at the Fastway
store, and she told him the girls were Aat home,@ by which he thought she meant they were back at Zula Mae=s. 
Williams testified that Appellant got in a car with a man he did not
know, and they drove off.  If Appellant
had asked him, he said, he would have taken the girls.  He had his car and his house had beds,
electricity, running water, and food. 
He also had a cell phone, and Appellant knew the number. 

Sammy Beatty, a neighbor, testified
that he has lived on Dallas Street all his life.  He was living two houses down from the structure where Bowden was
staying, and was renovating the home next door.  In a statement to police after the fire, Beatty said that Athe kids should never have been in
that house,@ although at trial, Beatty
testified Athe house was fine to me as far as
them being in that house.  But, you
know, some people may say maybe they shouldn=t have been there because the house was -- you know, didn=t have everything like water and
stuff.@  









On
the night of the fire, Beatty recalled, he was awakened by the sound of glass
breaking and noise like screaming or yelling. 
He jumped up and tiptoed down the alley where he saw a glow coming from
the fire in the back.  He saw Bowden
standing outside, Ahysterical,@ and screaming Amy babies, my babies.@ 
Brenda Strawn, Beatty=s girlfriend, also testified that, on the night of the fire, she heard
screaming and glass breaking.  By the
time she got her clothes on and went outside, Beatty had already been outside
for about ten minutes.   Strawn saw
Bowden, who was Alike in shock or something.@ 
He just shook his head when she asked him what was happening.  She then saw Beatty trying to put out the
fire.  

A
police investigator, John Lindsay, testified that he was on duty and was close
by when he heard the dispatch with the address of the fire at about 1:30 a.m.
on the police radio.  He arrived within
30 seconds, he said, before the fire trucks. 
The building was already completely engulfed in flames.  He encountered Bowden in front of the house
with a towel wrapped around one hand. 
He recalled that Bowden told him: 
A[M]y babies are inside, my babies
are inside.@ 
Bowden was frantic, nervous, and scared about the fate of the
children.  








When
the fire department arrived, Officer Lindsay began directing traffic and saw
Appellant arrive after the fire was extinguished, although he did not know at
that time that she was the mother of the children.  She was in the crowd that had collected and left the scene
accompanied by two other people, one of whom placed a blanket around her
shoulders.  Later, he was asked to look
for her and bring her back, and he found her at the Budget Inn about 2:30 a.m.,
crying, with the blanket still around her. 
She went with him back to the scene, and he later took her to the police
station where she was questioned.  

Police
Sergeant Ginger Harrill interviewed both Bowden and Appellant at the police
station within a few hours after the fire. 
The State offered videotapes of statements of Bowden and Appellant,
which were admitted together with an audiotape of a second statement of Bowden
taken two days later.[4]  

Bowden=s first statement was taken at
about 4:00 a.m., on the morning of the fire. 
He told Sergeant Harrill that he had been staying at the abandoned house
as he had just started working and wanted to save money until he could find an
apartment.  He had stayed there a couple
of years before and cared for an old man who died.  Appellant asked if the girls could stay with him at the house
that night because she wanted to go out. 
Bowden agreed, he said, and put the girls to bed in the back bedroom
about 7:30 or 8:00 p.m.  








Bowden
stated that he lit the candle because there were no utilities there and he did
not want the girls to be in the dark. 
He checked on the girls twice, then went to the couch in the front room
where he fell asleep.  He did not know
why he did not think to blow the candle out. 
When he woke up to check on the girls, the back room was on fire; flames
were coming out of the door between the front rooms and the back room, and he
could not get into the room where the girls were because of the flames.  He was calling the girls and they were
screaming.  He ran out the front door
and broke out the bedroom window, cutting his hand and knocking over a dresser
sitting in front of the window, but still could not get in because of the
flames.  He then went to the back and
knocked down the door that had been nailed shut but could not get in that way.  He ran through a hole in the fence and
yelled to several people who had gathered to call the fire department.  By that time, he could see flames in the
front room and coming from the roof. 

Appellant
was interviewed at approximately 5:00 a.m., still wrapped in the blanket and
showing signs of recent crying.  As
noted by Sergeant Harrill when Appellant could not think of her daughters= birthdays, Appellant was under a
great deal of stress.  In response to
questions from Sergeant Harrill as to her activities of the evening, Appellant
recalled that she had gone to the store twice, the first time to get cigarettes
and, as she had no money left for food the girls had wanted, she went back the
second time at about 10:00 p.m., to get them ALittle Debbies@ and chips.  








Appellant
said that, before she left the second time, she checked the house and went in
the back room, and that was when she lit the candle, a Amelted candle . . . inside an
aluminum pie plate,@ because it was getting dark, and
she set it on the middle of the bed. 
The girls were awake and in the front room on the couch at that
time.  By the time she left, they had
gone in the back room, she said, and Bowden had gone back there with them.  She knew they were lying on the bed because
she Ahollered@ 
and asked them if they were on the bed and they said Ayes, ma=am.@  She said
she did not know where Bowden later set the candle. 








Appellant
denied that she had any plans for the evening. 
She recalled that, after she left Bowden with the girls the second time,
she first stopped off at about 8:25 p.m. at the house of a neighbor who had
called to tell her that a man named Jerry wanted her to call him, and she spent
some time sitting in the yard visiting with the neighbor, trying to contact
Jerry.  She never was able to talk to
Jerry, and arrived at the store at about 10:00 p.m.  She started walking after she bought the food the girls wanted,
got a ride from a man in a van, went to the Budget Inn, and spent time visiting
with women known as AEasy B@ and ADee,@ who stayed there.  She did not
believe it at first when a man told her that her children had been Aburned up@ in the fire, but then realized she
needed to get back and got a ride back to the house, and that is when she saw
the girls Alaying there.@ 

Appellant
stated she had only taken the children down to the place where Bowden was
staying to spend the night on two or three other occasions.  But, she told Officer Harrill:  ALike Mama said, we should=ve brought >em home.@ As to why she didn=t, Appellant answered, Abecause Mama wasn=t there.  Mama don=t make it home until after 5:30.@ 
Appellant volunteered to Sergeant Harrill:  AI know that room, I put the
dresser. . . I put the stuff there in that room.  I sat the dresser in front of that window. . . and a chair in
front of that door and that door was locked. . . .@ 
At that point, Sergeant Harrill terminated the interview.  








In
his second statement two days after the fire, Bowden told Sergeant Harrill
that, in addition to the boarded up back door and the dresser in front of the
window, the room where the girls were had two interior doors, but one opened to
the inside of the girls= room and had no doorknob; thus,
the girls could not have opened it from their room and he would have had to
push on it from outside the bedroom to open it.  Bowden at first insisted again that he was the one who lit the
candle.  He stated that the girls were
asleep when he lit it at about 9:30 p.m., before he went down to a neighbor=s for a minute, in case they woke
up so they Acould see.@ 
But he then remembered that Appellant lit the candle while they were in
the bedroom talking and sitting on the bed before she went out that night.  She set it on the bed, he said, and he later
set it on the floor and pushed it back away from the bed.  

Battalion
Chief Lynn Holzer of the Wichita Falls Fire Department testified that he
arrived about four minutes after the dispatch call at 1:33 a.m.  A fire squad was already there stretching
hose over the fence.  He did a
walk-around and noted that there was no meter hookup or utilities and he
assumed the house was vacant.  A couple
of minutes later he learned children were trapped inside.  But by the time he arrived, he said, the
fire was fully involved, and it was impossible to enter the house because it
was Atoo far gone.@ 
A person trying to go into the house would not have lasted two or three
seconds.  He testified that he could not
give a time frame for how long the house had been on fire when he arrived.   








Chief Holzer testified that the
Fire Department learned that children were inside from people in the
street.  They got inside as fast as they
could after putting the fire out, and began pulling away material from the back
of the roof that had collapsed.  Fire
was still burning under the roof.  They
had to enter the back room from outside as the front was blocked by debris.  The first body was found when it fell out on
the ground as some roof material was pulled away. The second body was found ten
or fifteen minutes later in the center of the room.  From all the reports, he said, it was never suggested that the
fire was intentionally set; it was uniformly determined to be Aaccidental.@ 


Jim Graham, the Assistant Fire
Marshal for the Wichita Falls Fire Department and a certified arson
investigator, arrived at the scene at 1:55 a.m. He investigated the fire and
testified as to his conclusions about the origin and cause of the fire.  Graham testified that he spoke briefly with
Bowden at the scene, and Bowden told him that there were no utilities so they
were using candles and that his girlfriend=s daughters were with him. 
According to Graham, Bowden described how he tried to get in the bedroom
door and cut his hand breaking out the window. 








Graham determined that the
northwest room in which the girls had been sleeping was where the greatest
amount of damage occurred.  He
identified the remains of a mattress on top of two sets of box springs in that
room.  He believed the point of origin
of the fire was somewhere up off the floor in the northwest room behind the
bed, and that the fire burned upward and outward toward the door Bowden stated
he tried to enter.  That door was within
a few feet of where the candle had been and was Aintimate@ with the ignition. 
Charring on what remained of the door was consistent with the fire
starting a few feet to the left of it. 
In his opinion, that door was closed during the fire. The fire would
have moved to the center of the room and the ceiling collapsed as the fire
grew.  Within a short period of only
five to seven minutes, the heat would have grown to the Aflashover@ point of eleven hundred to twelve
hundred degrees in that room.  

Nothing was found to indicate the
fire was intentionally set, such as flammable liquids or patterns, and he
excluded smoking, appliances, or heating. Graham concluded that the fire was Aunquestionably accidental.@ 
In his opinion, the fire most likely started in the back bedroom by the
accidental introduction of an open flame, when clothing or a sheet came into
contact with the candle, perhaps when one of the girls rolled over on the
bed.  

Graham explained that children
under the age of five have a much greater proportion of fire-related deaths
than older persons, whereas thirteen- or fourteen-year olds have a much better
chance of getting out of a fire.  Seven-
and eight-year olds are somewhere in the middle and may be able to get out but
would Amore than likely@ need assistance or direction to
get out of the room through the only available doorway.  In Graham=s opinion, the girls were close enough to the door that
they should have been able to make it to the door but, instead, both of their
bodies were found Aremote@ from the doorway. 








Graham further testified that one
girl had apparently crouched against the back wall; the other was found face-up
in the center of the room, indicating that she may have been trying to climb
the dresser toward the window and fell back when the dresser was knocked
over.  The autopsy report revealed that
one of the girls had enough carbon monoxide in her to have affected her ability
to escape or make any kind of decisions. 
There were a number of things going on in the room affecting their
ability to make decisions:  the lowered
oxygen, carbon monoxide, and all the effects of a fire. 

ANALYSIS

I. 
Legal Sufficency of the evidence








Appellant=s first point complains that the
evidence is legally insufficient to establish the elements of the offense
beyond a reasonable doubt.  In reviewing
the legal sufficiency of the evidence to support a conviction, we view the
evidence in the light most favorable to the verdict in order to determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross v.
State, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).[5]  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443
U.S. at 319, 99 S. Ct. at 2789.  

The trier of fact is the sole judge
of the weight and credibility of the evidence. 
See Tex. Code Crim. Proc.
Ann. art. 38.04 (Vernon 1979); Margraves v. State, 34 S.W.3d 912,
919 (Tex. Crim. App. 2000).  Thus, when
performing a legal sufficiency review, we may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the fact
finder.  Dewberry v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131
(2000).  We must resolve any
inconsistencies in the evidence in favor of the verdict.  Curry, 30 S.W.3d at 406.  The standard of review is the same for
direct and circumstantial evidence cases. 
Burden v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); Kutzner
v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).








Appellant argues that there is
legally insufficient evidence of Areckless injury@ because there is no evidence of a substantial or
unjustifiable risk of serious bodily injury to the children, that she was aware
of the risk, or that she consciously disregarded it.  In that regard, Appellant contends that the State merely alleged
reckless injury by having the children in a house without utilities as opposed
to a home that had them.  She reasons
that, under the State=s theory, presumably Appellant
would have no culpability for the girls= deaths if they had perished in a fire from a lit candle in
their grandmother=s home or some other building with
working utilities, and that having utilities does not prevent candle
fires.  She points out that both Chief
Holzer and the arson investigator testified that the majority of accidental
fires are caused directly or indirectly by either gas or electric utilities,
and that the arson investigator agreed that the fact that a home did not have
utilities did not make it an immediate threat. 
Thus, Appellant contends that simply having the children in a house
without utilities should not be considered Areckless.@  We disagree, however, with
Appellant=s interpretation of the State=s allegations and evidence. 








The State did not merely allege
that Appellant took the children from a house with utilities to a building without
utilities but also that she left the children in a room in that building and
left a lit candle in the room or left them to sleep in the room with a burning
candle.  The evidence of these facts was
undisputed.  Zula Mae was raising
Appellant=s daughters in her home with
electricity, beds, and running water. 
Appellant was supposed to have stayed with the girls at Zula Mae=s house until Zula Mae got home on
the night of the fire.  But Bowden and
Appellant took the girls from that house about 5:15 p.m., before Zula Mae
returned from work.  Zula Mae had worked
at Sike=s Center Mall for twenty-five
years, and Appellant admitted that she knew Zula Mae would be home from work by
5:30.  The jury could have reasonably
concluded that Appellant and Bowden could have waited with the girls at Zula
Mae=s house until Zula Mae returned,
and then left them with her for the evening. 
Or the jury could have inferred that Appellant and Bowden could have
returned the girls to Zula Mae=s house later when Appellant decided to go out for the evening or that
Appellant could have even asked their father, Charles Williams, to take the
girls to his home, which also had utilities, when she saw him at the
store.  








The evidence was further undisputed
that Appellant chose, instead, to take the girls not simply to a house without
utilities but to an abandoned structure that was her boyfriend=s temporary living quarters that
she knew had no lights, no kitchen, and no bathroom, that she chose to put them
in the back room with a candle she lit, and that she chose to leave them there
for several hours to sleep in a room which she knew had only one exit, the door
that the jury was free to believe was shut during the duration of the
fire.  There was evidence of an obvious
risk of danger from Zula Mae=s testimony that she had warned both Appellant and Bowden not to be
taking the girls there and burning candles, and from the statement of the
neighbor, Sammy Beatty, that the girls should never have been in that
house.  Viewing the evidence and
inferences most favorably to the verdict, the jury could have rationally found
that Appellant=s conduct in leaving them to sleep
in that room with the candle burning for more than five hours exposed the girls
to a substantial risk of serious bodily injury.     

Appellant next contends that there
is no evidence that she was aware of 
the risk.  Appellant argues that
the only evidence of her awareness was the warning by Zula Mae, but that Zula
Mae admitted she had never been to the house and, therefore, had no personal
knowledge of the actual risk.  Appellant
also points out that the neighbor, Sammy Beatty, testified that the house was Afine@ to him.  But
the jury was free to accept Zula Mae=s testimony regarding her warning of the danger to
Appellant as evidence of Appellant=s own awareness of the risk, regardless of Zula Mae=s knowledge, especially in light of
Appellant=s admission that Zula Mae was Aright,@ that they should have taken the girls
home.  The jury was likewise free to
disregard Beatty=s testimony that the house was fine
for the girls to be in and to accept his statement that the girls Ashould never have been in that
house.@








Additionally, the jury heard Zula
Mae=s testimony that Appellant had told
her that she always made sure to put the candles out before going to sleep and
could rationally conclude from that evidence that Appellant was aware of the
risk of fire from the candles.  The jury
could further have believed that Appellant was aware of the danger from Zula
Mae=s testimony that she believed
Appellant would have extinguished the candle if she had been at the house that
night.  Finally, the jury could have
concluded that Appellant was aware of the risk from the testimony that she lied
to the girls= father at the convenience store
about where they were.    

Moreover, by her own statement,
Appellant was familiar with the room where she placed the children to sleep,
knew that the dresser was in front of the only window because she had put it
there, and must have also known there was only one possible escape route
through an interior door with the back door boarded up and the other door
lacking a knob.  








Appellant argues that the presence
of the candle posed a risk only to the extent that it remained lit while the
children were asleep in the room, but that they were still awake when she left,
and she had no opportunity to extinguish the candle while she was gone.  However, again, we note that it was Appellant=s choice to be gone for several
hours.  And regardless of whether the
children were still awake, the jury heard Appellant=s statement that she made sure they
were in the bed before she left with the candle still burning in the room and
had no reason to think they would still be awake several hours later when she
returned.  We conclude that there is
legally sufficient evidence that Appellant was aware of and consciously
disregarded a substantial risk of serious bodily injury to the girls by leaving
them to sleep with the candle burning in the room.

Appellant next contends that the
State failed to establish that there was no justification for taking the
risk.  Appellant points out that Zula
Mae was not home when Appellant and Bowden took the girls and argues that there
is no evidence as to what time Zula Mae arrived home and no evidence that the
children would have been safe there alone at Zula Mae=s house or how safe the streets
would be to travel on that night, so that whether the children would have been
safer by staying or returning to Zula Mae=s home is speculation. 









Contrary to Appellant=s argument, Zula Mae testified that
she arrived home at 5:30 p.m.  Appellant
knew where her mother worked, and knew that she would arrive home at 5:30
p.m.  And, according to Charles
Williams, Zula Mae was at home when he called about taking the girls to
Waxahachie.  Zula Mae stated she waited
throughout the evening for the girls to return.  Thus, the jury could conclude that the children need not have
been left at Zula Mae=s alone because she arrived within
fifteen minutes after Appellant and Bowden left.  And if they had waited the fifteen minutes, there would have been
no need to walk the few blocks to return the children to her house later.  Moreover, the jury could reasonably have
concluded from Appellant=s own description of her activities
during that evening that Appellant and Bowden had no compelling reason even to
take the girls down to Bowden=s place that night.  Viewing the
foregoing evidence and inferences in the light most favorable to the verdict,
we conclude that there was legally sufficient evidence that the risk to which
Appellant=s conduct exposed the girls was
unjustified.

We also conclude that the evidence
is legally sufficient to show that Appellant=s conduct, not in merely leaving the girls in a room
without utilities but in leaving them in that structure and in that room to
sleep with a candle burning for light and only one escape route, rather than
leaving them at their own home or returning them to their own home which had
utilities, constituted a Agross deviation from the standard
of care that an ordinary person would exercise under all the circumstances as
viewed from [appellant=s] standpoint.@ 
Tex. Penal Code Ann. ' 6.03(c).   








Appellant makes several additional
arguments that we will interpret liberally as attempting to challenge causation
by arguing that it was Bowden=s conduct, rather than hers, that caused the fire and the deaths of the
girls.  Appellant argues that she left
the children in Bowden=s care, that there was considerable
evidence that he cared for the children as his own, and that there was no
evidence suggesting she should have suspected he could not be trusted to
carefully watch the girls.  Appellant
contends that she had no way of knowing that, after she left, he would move the
candle down onto the floor and push it behind the bed, or that he would leave
it burning.  She argues that it must
have been Bowden=s placement of the candle that
caused the fire.  Finally, she contends
that she had no opportunity to extinguish the candle because she was not there
when the girls fell asleep.








Under
Section 6.04(a) of the penal code, as previously stated, a person is criminally
responsible if the result would not have occurred but for his conduct,
operating either alone or in conjunction with another cause, unless the
concurrent cause was clearly sufficient to produce the result and the conduct
of the actor clearly insufficient.  Tex. Penal Code Ann. ' 6.04(a).  Two combinations may exist to satisfy the requisite causal
connection and the harm when there are concurrent causes:  (1) the appellant=s conduct may be sufficient, by
itself, to have caused the harm, regardless of the existence of a concurrent
cause; or (2) the appellant=s conduct and the other cause together may be sufficient to cause the
harm.  Robbins v. State, 717
S.W.2d 348, 351 (Tex. Crim. App. 1986); Umoja v. State, 965 S.W.2d 3, 9
(Tex. App.CFort Worth 1997, no pet.).  Under either scenario, criminal
responsibility is limited by the qualification of Section 6.04(a), Aunless the concurrent cause was
clearly sufficient to produce the result and the conduct of the actor clearly
insufficient.@ 
Thus, evidence of causation will be legally insufficient only when the
conduct of the appellant, standing alone, is Aclearly insufficient.@  Marvis v.
State, 36 S.W.3d
878, 881 (Tex. Crim. App. 2001) (Price, J., concurring).         Here,
the evidence shows that a concurrent cause, Bowden=s conduct in leaving the children
alone in the room asleep with the candle burning after placing it on the floor
but still near enough to set fire to the bedclothes, was clearly sufficient to
have caused serious bodily injury to the girls based on the fire investigator=s conclusion that fire in which
they died was, indeed, caused in that manner. 
The evidence that Appellant and Bowden together took the children to the
structure where Bowden was staying without utilities, together agreed that he
would stay with the girls, and together left the candle burning in the same
room with the girls in bed for the night, with both knowing that all possible
exits but one were blocked and both knowing that burning candles with the
children there was dangerous, was sufficient to establish that Bowden=s and Appellant=s conduct together was sufficient
to have caused the harm.  This leaves
the question:  Was Appellant=s conduct, standing alone, Aclearly insufficient?@

As
the girls= mother, Appellant was at least as
responsible as Bowden for the decision to take them from Zula Mae=s house to the structure, and she,
herself, Aknew that room,@ had placed the dresser in front of
the window and the chair in front of the locked door.  Appellant lit the candle and made sure the 








girls were in bed in the room with
the candle burning before she left for several hours.  From the evidence that she always made sure to extinguish the
candle, the jury could have inferred that Appellant assumed the role of making
sure of extinguishing the candles in that house.  This is supported by her statement to Sergeant Harrill that she
had no idea what Bowden may have done with the candle after she left.  The jury could have inferred that Appellant
was aware of but disregarded the risk that Bowden would not know what to do
with the candle, specifically that he should extinguish it before leaving the
room with the girls asleep.  Moreover,
Appellant acknowledged that she did not expect the girls to be awake when she
returned hours later.  Thus, the jury
could have further inferred that she was aware of but disregarded the fact that
they would fall asleep with the candle burning.        

We conclude that the record, viewed
in the light most favorable to the verdict, supports the inference that if
Appellant had not taken the children to that house and put them to bed with the
candle burning that she, herself, had lit, or if she had at least been there to
extinguish the candle before the girls went to sleep as the evidence indicated
she probably would have done, the girls would not have died in the fire. Thus,
we cannot conclude that Appellant=s conduct was Aclearly insufficient,@ standing alone, to cause serious bodily injury and death
to the girls.  We hold that there was
legally sufficient evidence that Appellant recklessly caused serious bodily
injury to the children as charged and found by the jury.  








                                             2.  Factual Sufficiency 

Appellant=s second point challenges the
factual sufficiency of the evidence to support the elements of the offense of
reckless injury to the children. In reviewing the factual sufficiency of the
evidence to support a conviction, we are to view all the evidence in a neutral
light, favoring neither party.  Zuniga
v. State, 144 S.W.3d 477, 482 (Tex. Crim. App. 2004).  The only question to be answered in a
factual sufficiency review is whether, considering the evidence in a neutral
light, the fact finder was rationally justified in finding guilt beyond a
reasonable doubt.  Id. at
484.  

There are two ways evidence may be
factually insufficient:  (1) the
evidence supporting the verdict or judgment, considered by itself, is too weak
to support the finding of guilt beyond a reasonable doubt; or (2) when there is
evidence both supporting and contradicting the verdict or judgment, weighing
all of the evidence, the contrary evidence is so strong that guilt cannot be
proven beyond a reasonable doubt.  Id.
at 484-85.  AThis standard acknowledges that
evidence of guilt can >preponderate= in favor of conviction but still
be insufficient to prove the elements of the crime beyond a reasonable doubt.@ 
Id. at 485.  








In other words, evidence supporting
a guilty finding can outweigh the contrary proof but still be insufficient to
prove the elements of an offense beyond a reasonable doubt.  Id. 
In performing a factual sufficiency review, we are to give deference to
the fact finder=s determinations.  Id. at 481; Cain v. State, 958
S.W.2d 404, 407 (Tex. Crim. App. 1997). 
We may not substitute our judgment for that of the fact finder.  Zuniga, 144 S.W.3d at 482.

Resolving conflicts in the evidence
is the jury=s role.  In doing so, it may accept one version of facts and reject
another, or reject any part of a witness's testimony.  Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App.
1981).  It is the jury's prerogative to
judge the credibility of the witnesses as well as the weight to be given their
testimony.  Banks v. State, 510
S.W.2d 592, 595 (Tex. Crim. App. 1974). 
Thus, we can consider only those few matters bearing on credibility that
can be fully determined from a cold appellate record.  Johnson v. State, 23 S.W.3d 1, 8 (Tex. Crim. App.
2000).  Conflicts between witnesses will
generally be inviolate, although the validity of testimony can be treated as
questionable because of other factors such as adverse conditions affecting the
ability of the witness to observe certain facts.  Id.  Our role is
not to "find" facts; rather, it is to see if we can determine that
the verdict is against the great weight of the evidence presented at trial so
as to be clearly wrong and unjust.  See
Clewis, 922 S.W.2d at 135. 

 








Viewing all of the evidence in a
neutral light, in addition to the evidence detailed above, it was undisputed
that Appellant did not leave the girls in the room alone to sleep with the
candle burning, but that Bowden had agreed to and did stay with the girls.  Bowden was in the room with Appellant when
she lit the candle before she left the second time, and Bowden was in the back
room with the girls when Appellant left. 
There was evidence that Appellant 
could have trusted Bowden to take care in keeping the girls that night.  Bowden and Appellant had been seeing each
other for about four years.  Charles
Williams and Sammy Beatty both testified that Bowden seemed to be a friend to
the girls and Beatty recalled that he sometimes heard them call him ADad.@  Beatty had
known Bowden for many years, since they were kids.  Beatty owned two houses on Dallas Street, including the one next
door to the structure Bowden was staying at. 
Beatty was remodeling it and Bowden was helping him.  Bowden also had started working at Bennigan=s with Beatty, so they worked
together almost every day.  Beatty
recalled that Bowden would get food for the girls at Bennigan=s almost every day. 








In Bowden=s first statement, he said he
checked on the girls twice during the evening. 
The girls were sleeping on a full size mattress on top of two king size
box springs.  They had a bottom sheet
and three covers.  He went in to check
on them to see whether they were cool or comfortable and they had changed
positions.  He had given the girls
sweatshirts to wear earlier because they were cold.  Ujeana had his sweatshirt on and Precious had made a pillow out
of the one he had given her to wear.  In
his second statement, Bowden elaborated that the girls were just like his own
children to him.  He spent his money on
them, and his time with them.  Zula Mae
had complained to him about how much he baby-sat the girls when Appellant would
go places.  The girls were always a
number one priority for him.[6]  There was no evidence that Bowden used drugs
or alcohol that night.  The jury could
reasonably have concluded that Appellant did not act recklessly in leaving the
girls in Bowden=s care with the candle still
burning.    








As
to whether the girls should have been in the house, Sammy Beatty testified that
he could not answer Ayes or no.@ 
He knew what it was like to be poor and Ado without,@ it can happen to anyone. 
He had been thinking of buying that structure a couple of years
before.  It was just right to add it to
his house.  To him, the house was Afine,@ meaning that it was fine enough that he wanted to
add it to his house; it was well-insulated, had better windows than his own, was
a solid structure, and he would not mind staying in it, himself.        The
evidence also showed that, once the fire started, it spread rapidly and reached
the flashpoint of over twelve hundred degrees within a very short time of five
to seven minutes.  When Bowden tried to
enter the room through the available door, he was blocked by the flames and
smoke.  And the arson investigator
agreed it would not have made any difference which room Bowden ran out of or
which direction he ran out to try to knock out the window or knock down the
back door.  Thus, there was evidence
that the girls could not be saved because of the intensity of the heat and
flames, rather than the blocked exits. 
Indeed, there was no evidence that Bowden or anyone else would have been
able to rescue the girls once the fire started.   

The
arson investigator further testified that most people in burning buildings
manage to get out.  The available door
was within six feet of the bed and there was Areally no reason@ the girls should not have been able to get to the door and
get out, unless the door were locked or obstructed or they were overcome by
heat, carbon monoxide, or lack of oxygen. 
They were old enough to at least try to get to the door and get out.  

 








As
to the lack of utilities, Battalion Chief Holzer testified that the majority of
home fires the department responds to are in homes with utilities and
that a major concern for them is to make sure the utilities are turned
off.  And the fire investigator agreed
that electrical distribution equipment such as wiring, outlets, and cords are
the second leading cause of fire death and the third leading cause of fires in
the United States.  Cooking fires are Anumber one.@ 
Only 15 percent of fires in 2001 were attributable to open flames or
embers. Fires can occur in homes that have utilities; lack of utilities does
not create an immediate chance that there will be a fire.  Sammy Beatty did not believe candles were
inherently dangerous and believed his girlfriend had some.  Zula Mae admitted she had scented candles in
her house that she used sometimes even when children were around. 

Zula
Mae acknowledged that, although the girls had described the house to her, she
did not personally go down to look at it. 
And the jury could have accepted Zula Mae=s testimony that Appellant said she always made sure
to put out the candles before going to sleep and probably would have done so
had she been there as evidence that Appellant exercised care with candles in
the house. 








There was no evidence that either
the condition of the structure, the boarded up door, or the lack of a door knob
on a second door was the sole cause, although there was some evidence that
these conditions were contributing causes, of the girls= bodily injuries and deaths.  It was undisputed that Appellant did not
leave the girls alone to sleep in the room with the candle burning but left
them awake with Bowden in the room to care for them, and there was evidence
that he was trustworthy to care for the children. 

Nevertheless, the evidence remains
that Appellant, along with Bowden, took the children to Bowden=s place and left them to sleep in a
room with the  candle burning in
disregard of her mother=s warnings and her own admitted
awareness of the danger of fire.  The
evidence remains that Appellant had no plans for the evening, yet she and
Bowden inexplicably could not wait fifteen minutes for Zula Mae to return from
work to keep the girls.  The evidence
remains that Appellant then left the girls for several hours while she looked
for AJerry,@ visited a neighbor down the
street, got a ride from a man outside the store, got a ride from another man
while walking to the Budget Inn, and spent the rest of the evening at the
Budget Inn.  Most significantly, the
evidence remains that she was not there to extinguish the candle when the
children went to sleep.  Had she been
there, Zula Mae said, Appellant probably would have extinguished the candle,
but for which the girls= tragic deaths would not have occurred.  








Viewing the evidence in a neutral
light, there is evidence both supporting and contrary to the verdict.  The jury could rationally have accepted
Appellant=s theory that the fire was simply a
tragic accident unconnected to her conduct in leaving the children with Bowden
to sleep in the back room with the lit candle. 
Or the jury could have rationally accepted the State=s theory that the conduct of both
Appellant and Bowden concurred in recklessly causing serious bodily injury to
the girls.  Under this state of the
record, we cannot conclude that the evidence supporting the jury=s verdict is so weak or the
contrary evidence so strong that the beyond-a-reasonable-doubt standard could
not have been met so that the guilty verdict cannot stand.  See Zuniga, 144 S.W.3d at 477,
481; see also Goodman v. State, 66 S.W.3d 283, 287 (Tex. Crim. App.
2001) (describing evidence in Afair equipoise@ as precluding reversal for factual
insufficiency).          








This is a troubling and tragic
case.  Poverty and having to Ado without@ is not a crime, but Appellant had
choices she chose to disregard.  And we
do not hold that evidence of leaving children with another adult in a room with
a candle burning, with or without utilities, standing alone, constitutes
conscious disregard of a substantial risk of serious injury.  Nor do we hold that failing to do what AMama says@ necessarily constitutes reckless
or even negligent conduct.  But we do
not sit as a thirteenth juror.  While we
may not have reached the same decision on the facts as the jury, when we
consider all of the evidence in a neutral light, we are compelled to conclude
that the proof supporting the verdict is not so weak nor the evidence contrary
to the verdict so strong that the jury was not rationally justified in finding
guilt beyond a reasonable doubt.  We
overrule Appellant=s factual insufficiency point. 

 

                                                   CONCLUSION

 

Having overruled both of Appellant=s points challenging the legal and
factual sufficiency of evidence to support the two counts of the offense of
reckless injury to a child causing serious bodily injury, we affirm the
conviction and judgment of the trial court.

 

 

ANNE GARDNER

JUSTICE

 

PANEL
F:     LIVINGSTON, DAUPHINOT, and GARDNER,
JJ.

 

PUBLISH

 

DELIVERED:  October
20, 2005

 











[1]Bowden=s conviction was affirmed by this
court in Bowden v. State, 166 S.W.3d 466 (Tex. App.CFort Worth 2005, pet. filed). 





[2]In addition to Precious and Ujeana,
who died in the fire, Appellant had three other children, another daughter aged
20, a son aged 18, a son aged 13, and one grandchild.  





[3]Since the fire, Williams had
learned that he was not the father of Ujeana, although he was listed as the
father of both on their birth certificates and had treated both as his
daughters since they were born.   





[4]The jury was instructed in the
charge not to consider Bowden=s statements as evidence against Appellant.  We will thus confine our consideration of his statements to the
extent that they provide contextual background and not as evidence against
her.  





[5]In a legal sufficiency review, we
consider only evidence that supports the verdict.  Clewis v. State, 922 S.W.2d 126, 172, n. 10 (Tex. Crim.
App. 1996).  To the extent that we
review all of the evidence, we are to do so only to determine whether it
supports the verdict.  Id.
(citing Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App.
1991).  





[6]He was angry that people said he
was not in the house when the fire started and that Beatty=s girlfriend said he did not know
if the girls were in the house at the time of the fire.  He said: AHow could I not know?@  It was very hard,
he said, for him to admit that he was in the house; he was there.  The arson investigator admitted he had no
facts that Bowden was not in the house when the fire started.