Ray MORALES, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–90–0155–CR.

Court of Appeals of Texas,
Amarillo.

March 26, 1992.

W. Clay Abbott, Lubbock, for appellant.

Travis Ware, Dist. Atty., Michael West, Lubbock, for appellee.

Before REYNOLDS, C.J., and DODSON and POFF, JJ.

## ON REMAND

REYNOLDS, Chief Justice.

On original submission, we affirmed the judgment decreeing the jury's conviction of appellant Ray Morales of intentionally and knowingly engaging in conduct that caused serious bodily injury to a child and his punishment of confinement for sixty years. *Morales v. State*, 814 S.W.2d 824 (Tex. App.—Amarillo 1991, pet'n granted).[1] En route to the affirmance, we overruled appellant's four points of error, determining that because he had not complied with Texas Rules of Appellate Procedure 74(f), he

had not properly raised his fourth-point contention of insufficient evidence to establish his state of mind at the time of the offense. *Id.* at 829.

In its discretionary review, the Court of Criminal Appeals held that appellant adequately raised his sufficiency claim, vacated our judgment, and remanded the case for our consideration of that claim. *Morales v. State*, 820 S.W.2d 805 (Tex.Cr. App., 1991). After further briefing,[2] our ensuing review of the record reveals sufficient evidence for the jury to find Morales' intent to cause serious bodily injury to the child, and we will affirm the trial court's judgment.

In developing his fourth-point contention, appellant submits, on the authority of *Alvarado v. State*, 704 S.W.2d 36 (Tex.Cr. App.1985), and *Beggs v. State*, 597 S.W.2d 375 (Tex.Cr.App.1980), that the State was required, but failed, to prove he intentionally and knowingly engaged in conduct resulting in serious bodily injury with the specific intent to cause serious bodily injury. His position is that his statement which the State introduced, the evidence of his frustration and the baby's disturbing crying, and the doctors' testimony, are not sufficient to establish the specific "result oriented" intent required by law.

Appellant agrees that our standard of review of his contention is as enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which was favorably quoted from 443 U.S. at 318–19, 99 S.Ct. at 2788–89, with emphasis supplied and citations omitted, in *Moreno v. State*, 755 S.W.2d 866 (Tex.Cr.App.1988), as follows:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must not be simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable

1. Facts giving rise to the prosecution under Texas Penal Code Annotated § 22.04 (Vernon 1989) are set forth in the prior opinion.

2. Upon reinstatement on the docket, the parties were requested to, and did, rebrief the point of error.

doubt. [footnote omitted]. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [citation omitted]. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [citation omitted].

*Id.* at 867. Then, because the jury is in the best position to consider all the evidence first hand, and view the valuable and significant demeanor and expression of the witnesses, the verdict must stand unless it is found to be irrational or unsupported by more than a mere modicum of evidence, with such evidence being viewed under the *Jackson* light. *Id.*

■ Proof of a defendant's culpable state of mind is almost invariably proven by circumstantial evidence. On the question of intent, the jury is called upon to review all the evidence and may reasonably conclude from the circumstantial evidence that the requisite mental state existed, *Warren v. State,* 797 S.W.2d 161, 164 (Tex. App.—Houston [14th Dist.] 1990, pet'n ref'd), which may be inferred from acts, words, and conduct. *Dues v. State,* 634 S.W.2d 304, 305 (Tex.Cr.App.1982). In this regard, the jury is the sole judge of the weight of the evidence and the credibility of the witnesses, and it may believe or disbelieve all or any part of any witness' testimony. *Williams v. State,* 692 S.W.2d 671, 676 (Tex.Cr.App.1984).

■ Given these guiding principles, it follows that the jury, receiving appellant's written statement wherein he said, "I dropped him, letting him go inside the tub," was not required to credit his later disclaimer, "I didn't mean to hurt him like that." *Johnson v. State,* 571 S.W.2d 170, 173 (Tex.Cr.App.1978). Instead, the jury could consider that appellant's intent was more reasonably inferable from his acts and conduct as revealed in the medical evidence.

The record reveals testimony from three medical experts which, by its quotation, accurately depicts the evidence before the jury. Doctor Ralph Erdmann, the pathologist who conducted an autopsy of the child, gave this testimony on direct examination:

Q Okay. Now then, in terms of the degree of injury that you saw in this baby's brain, and in the skull and in between the scalp and the skull, would you describe those injuries as serious bodily injuries?

A Yes.

Q Okay. In fact, were they critical injuries?

A Bad enough to have killed the baby, yes, ma'am.

Q Okay. Now then, the kind of force that would be necessary to cause the degree of injury which you saw, would that be just consistent with dropping a child into—

A No, ma'am.

Q —from this level, onto a hard object? (Indicating)

A No. No, Not—particularly when you have the bruising under the scalp. That doesn't happen from that; that is more than one area.

\* \* \* \* \* \*

Q Okay. Would the injuries that you saw be more consistent with a slamming motion?

A Well, remember, there is more than one place.

Q Right.

A Unless you tell me several slammings.

Q Is that what it's consistent with?

A Would be more consistent, yes.

From Dr. Rafael Garcia, a consulting pediatrician, the State adduced the following information:

Q During the time that—what was the purpose of having you be a consultant; why were you called in?

A There was—there was a concern as to how the child came to the condition of being critically injured. The parent explanation provided for it did not match with how serious the child was. And in

cases like that I am often talked to and asked to provide an opinion, to assist the physician in what they do.

\* \* \* \* \* \*

Q  Okay.  In terms of [the child], can you tell us what type of injuries he had sustained?

A  Well, from the exams that we can do clinically, he was found to have skull fractures, called comminuted skull fractures where the actual crack in the skull goes in more than one direction.  And he was found to have blood around the brain, intercranial bleeding.  He have (sic) found to have hemorrhage into the eyes.

\* \* \* \* \* \*

Q  Okay.  And what were the two explanations that were given?

A  On the form used by the people who first attend the infant, the nursing assessment says, "Infant reportedly has had respiratory infection for one week; was getting a bath."  Says, "Dad turned to get towel, and when turned around, thought infant was asleep."

Then in parenthesis, the writer, the author writes, "in tub, water running but no stopper, wasn't building up in the bathtub."

And then concludes, "Reportedly infant never completely stopped breathing."

The other is the admit history and physical from the senior pediatric resident, Dr. Higgins.  Says, "Father was alone with the child, mother at work, at at (sic) about A.M.," says, "on the 31st of December of '89, placed infant in the bathtub."  Says, referring to the father, "He states that [the child] was very fussy and had a lot of nasal discharge. At about 9:15 he left the bathroom for 'less than a minute', and returned to the bathroom.  [The child] was laying on back in the bathtub with eyes closed, but still breathing.  No sinosis," or he hadn't turned blue.  "Water was already drained from tub.  Father states he did not hear any sounds as if [the child] had fallen.  Father picked him up and patient's head fell backward."

Q  Dr. Garcia, you had that information when you were examining and consulting on this case.  Can you tell the jury why the injuries that you saw were not consistent with either one of those stories?

\* \* \* \* \* \*

A  The kind of injury to the head that involved bleeding inside the head is—is a major traumatic event.  It does not involve even rolling off a sofa or couch or something like that, that kind of trauma which is fairly frequent or at least not uncommon in infants.  This involved a major traumatic event for this infant. So the idea of taking a child to the bathtub and somehow in positioning him there or the child was sitting there that he, the next minute, father is not gone more than a minute, doesn't hear sounds and then you come and this child is now limp and somnolent or sleepy, he is not alert any more, and there is no other explanation, it's just—there is just no fit in that account and the findings that are shown on this infant.

\* \* \* \* \* \*

Q  Okay.  Let me ask you though, Dr. Garcia, based on your medical experience and your training in this area—you have done thousands of examinations on normal children, children with just accidental injuries and then children with intentional injuries, correct?

A  That is correct.

Q  Okay.  Based on your medical experience, would it require very much force to cause the type of injuries that you saw on [the child]?

A  They would take very significant force . . . .

\* \* \* \* \* \*

Q  Okay.  And the injuries that you saw, if you would assume with me, Dr. Garcia, that this 8 month old infant was taken into the bathroom, held at chest level by someone who was approximately 5 foot 4 to 5 foot 8, dropped directly into a porcelain bathtub, and struck his head,

are the injuries consistent with what—with that?

A I don't think so.

\* \* \* \* \* \*

Q Okay.... The injuries that you saw, are they consistent with the baby that you saw at the autopsy being slammed against something, and also perhaps shaken?

A They are consistent, yes.

Doctor Jim Higgins, the treating pediatrician, added the following testimony:

Q Okay. Are you familiar with the shaken impact syndrome?

A Yes, I am.

Q Okay. And in your opinion after treating [the child], did he have the shaken impact syndrome?

A The injuries that we saw were consistent with that, yes.

\* \* \* \* \* \*

Q Okay. The amount of the injury that you saw, is it also your opinion that a great deal of force was required to cause these injuries?

A Yes.

\* \* \* \* \* \*

Q Okay. The fractures you saw were massive?

A Yes.

Q Okay.

A Extremely.

\* \* \* \* \* \*

Q Okay. The injuries that you saw with [the child], were they serious bodily injury that caused a substantial risk of death?

A Certainly, yes.

Q In fact he died from those injuries?

A I believe so, yes.

From this medical evidence that "several slammings," and "significant force," as well as a "great deal of force," was required to produce the child's severe injuries, any rational trier of fact reasonably could find not only that appellant's disclaimer of intent to "hurt [the child] like that" was disproved, but that he intended to cause the child serious bodily injury. Medical evidence of this nature is sufficient

for the jury to infer appellant's intent to cause the child serious bodily injury. *Moore v. State,* 708 S.W.2d 484, 487–88 (Tex.App.—Dallas 1986), *rev'd on another ground,* 749 S.W.2d 54 (Tex.Cr.App.1988); *Crouch v. State,* 702 S.W.2d 660, 662–63 (Tex.App.—Tyler 1985, pet'n ref'd). Appellant's fourth point of error is overruled.

The judgment is affirmed.