**Opinion filed September 30, 2015**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-14-00005-CR, 11-14-00006-CR, 11-14-00007-CR, & 11-14-00008-CR

_____

## CANDRA NICOLE APPLEGATE, Appellant
## V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the 259th District Court**
**Jones County, Texas**
**Trial Court Cause Nos. 010734, 010735, 010736, & 010738**

## M E M O R A N D U M   O P I N I O N

The jury convicted Candra Nicole Applegate of two third-degree felony offenses of bodily injury to a child and two first-degree felony offenses of serious bodily injury to a child. The trial court assessed punishment at confinement for ten years for each of the convictions for bodily injury to a child and confinement for twenty-six years for each of the convictions for serious bodily injury to a child. The trial court sentenced Appellant and ordered that the sentences run concurrently. Appellant challenges all four of her convictions on sufficiency grounds. She also

claims, in all four appeals, that improper comments by the trial judge fundamentally harmed her case. We affirm all four of her convictions.

## I. *The Charged Offenses*

The grand jury, in two separate indictments, alleged that Appellant intentionally or knowingly caused her child, T.L.W., to suffer (1) serious bodily injury when Appellant fractured T.L.W.'s leg and (2) bodily injury when Appellant fractured T.L.W.'s arm. The grand jury also alleged in a third indictment that Appellant intentionally or knowingly caused another of her children, W.L.W., to suffer bodily injury when she fractured his arm. The grand jury alleged, in the indictments, that the injuries were sustained by "manner and means unknown to the Grand Jury." The grand jury also indicted Appellant on a fourth offense, alleging that she intentionally or knowingly, by omission, caused serious bodily injury to T.L.W. when Appellant failed "to provide the child with medical care." As T.L.W.'s mother, Appellant had a statutory duty to ensure that T.L.W. received medical care.

A person commits an offense if she "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child" serious bodily injury or bodily injury. TEX. PENAL CODE ANN. § 22.04(a)(1), (3) (West Supp. 2014). If the person causes serious bodily injury, then the offense is a felony of the first degree. *Id.* § 22.04(e). The offense is a felony of the third degree if the person causes bodily injury. *Id.* § 22.04(f). For the State to prove the offense of serious bodily injury caused by omission, a defendant must have "a legal or statutory duty to act." *Id.* § 22.04(b)(1). Appellant pleaded not guilty to all four offenses, and the State prosecuted all four offenses in one trial.

## II. *Evidence at Trial*

In October 2010, Appellant and Daniel Wright had twin babies: T.L.W., a girl, and W.L.W., a boy. Nine months later, Appellant took her twins to see Dr. Justin Smith for a physical checkup.

### A. *Dr. Smith's Testimony*

Dr. Smith noticed a bruise on T.L.W.'s left leg and ordered an X-ray. The X-ray revealed fractures above and below T.L.W.'s knee. Dr. Smith then ordered a full skeletal survey, which is a series of X-rays of the entire body, because he had "a high suspicion for abuse" and "injury to the child." The full skeletal survey revealed that T.L.W. had multiple broken bones. Appellant claimed the injuries had been caused by "lifting the baby by one leg to change [her] diaper." Dr. Smith ordered a full skeletal survey of W.L.W. as well, and that survey also revealed numerous fractured bones. T.L.W. and W.L.W. had a combined total of fifteen fractured bones. Dr. Smith testified that the twins did not show signs of osteogenesis imperfecta or brittle bone syndrome.[1]

### B. *Dr. Dumas's Testimony*

Doctor Michel Dumas, a radiologist, interpreted the full body skeletal surveys. Dr. Dumas opined that, in cases of children under one year of age, an "abnormal skeletal survey . . . raises a suspicion of child abuse." He held that opinion because such children are not "able to walk and run and play and jump off of things." He also explained that "there's got to be some good explanation for how that child had a force that could break a bone applied to one of its limbs or bones." Dr. Dumas then described T.L.W.'s and W.L.W.'s injuries.

---

[1]Osteogenesis imperfecta is a condition that causes brittle bones and can increase the likelihood of broken bones from even minor trauma.

T.L.W.'s left arm had several fractures in it. Dr. Dumas believed the injuries occurred "at least several days," and in some cases, many weeks, prior to the X-rays being taken. He agreed that the fractures were caused by a "twisting motion of tremendous force" or a "snapping motion of tremendous force," but he could not explain exactly how the injuries occurred. T.L.W.'s right femur had also been fractured; the wound had healed with a 30-degree bend in it so that the leg was now abnormally shaped. Dr. Dumas testified that, if the injury had received prompt medical care, the injury would not have healed with a "permanent angular deformity." Finally, he agreed that the wound caused protracted loss of the use of the limb.

Dr. Dumas also described "corner fractures" found in T.L.W.'s left leg. Corner fractures are specific for child abuse because they come "from a twisting injury or a pulling injury that you would typically only see in a situation where a child is maybe swung by their leg or having their leg twisted with such force as to induce pain." Dr. Dumas agreed that there is "a tremendous amount of physical force" needed "to cause a corner fracture." Dr. Dumas believed the corner fractures suffered by T.L.W. were "not accidental trauma" and were not the result of horseplay. Dr. Dumas remarked that T.L.W. had "the most dramatic corner fractures" that he had ever seen, or heard of, in medical case studies; he also agreed that an adult woman could inflict such injuries. Dr. Dumas explained that "every textbook and research [study] says that [corner fractures are] highly specific for child abuse."

Dr. Dumas then testified that W.L.W. had also suffered four corner fractures in his legs. Furthermore, W.L.W.'s right hand exhibited an injury at least three to four weeks old that, if seen in an adult, Dr. Dumas opined would be consistent with a hammer striking the hand. Dr. Dumas described the injury as "a very unusual

fracture for a child." W.L.W. had also suffered a fracture in his left forearm that appeared to be about a month old. Dr. Dumas opined that W.L.W.'s injuries were not accidental.

### C. Ms. Brooks's and Ms. Cosby's Testimony

Julia Elaine Brooks, Daniel's mother and the twins' grandmother, acknowledged that someone had abused the twins. Elaine indicated that only Daniel or Appellant could have been responsible for the abuse. Elaine explained that M.C., Appellant's two-year-old daughter and the twins' half-sister, lived with her and her husband, George Brooks, after doctors discovered that M.C. had a broken collarbone and had substantial bruises all over her body.[2] Elaine never saw Daniel or Appellant be "physical" with M.C. But when Elaine and George would drive M.C. by Appellant and Daniel's home on the way to drop her off at school, M.C. would become terrified. M.C. would beg them not to return her to Appellant and Daniel. George corroborated this testimony.

Ashly Cosby was Appellant's cousin by marriage, and she knew Appellant and the twins well. She noticed that "[a] lot of times" the twins had bruises on their bodies. Appellant and Daniel claimed that the twins' cribs caused the injuries. Cosby let Appellant use a mesh playpen for the twins to sleep in because it never caused bruises on Cosby's children. Nevertheless, the twins continued to have bruises.

Cosby testified that Appellant stayed at home to take care of her twins until Appellant lost custody of them. But Daniel worked during that time period. Appellant admitted to Cosby "that Daniel was never alone with the children except on a few rare occasions." Appellant also indicated that Daniel did not interact much with the twins. In contrast, Appellant "was with the twins all the time." Cosby

---

[2]The grand jury indicted Appellant for intentionally or knowingly causing bodily injury to M.C., but the trial court granted an instructed verdict as to that charge and it is not a subject of this appeal.

reviewed pictures of the twins, which were taken in the months prior to July 2011; she pointed out various bruises on their bodies and faces. After the twins were removed from Appellant and Daniel's custody, Cosby took care of the twins for a couple of months. During those months, Cosby never recalled the twins having any bruises.

Cosby agreed that Appellant never seemed like she was not "trying her best," and Cosby never saw Appellant exhibit violent behavior toward the children. Cosby felt comfortable enough to leave her own children with Appellant on a "handful" of occasions—meaning less than ten times. Cosby observed that Daniel did not seem comfortable with the twins and that M.C. "always seemed very afraid of him." Cosby recalled that Daniel was alone with the twins once when she and Appellant left one evening to walk at the track.

*D. Testimony of Twins' Father and of Ranger Parker*

Daniel believed that Appellant suffered from post-partum depression after the birth of the twins. He testified she failed to take her prescribed medication and appeared depressed and "stressed out." Daniel claimed that, for the first nine months of the twins' lives, he worked multiple jobs, and Appellant was with the twins "24 and 7." Once while Daniel was at work, Appellant called him eight or nine times and asked him to return home because she could not care for the children. On one occasion, Daniel came home for lunch and found W.L.W. lying on the ground; "his right foot was split open pretty good." Daniel remarked that the cut was so deep that it "looked like maybe it was to the bone." Appellant appeared unaware of this serious injury until Daniel brought it to her attention. In response, she told Daniel dry skin caused the wound.

On another occasion, Appellant called Daniel at work because M.C. was "unruly and screaming, yelling." Daniel went home to find M.C., hiding in her

room, with a handprint on the side of her face; M.C. was crying and screaming. Daniel also noticed swelling and knots on W.L.W.'s body at various times. When he questioned Appellant, Appellant said M.C. or a toy had caused the injuries. Daniel testified about a specific occasion when he had T.L.W. on his shoulders and she threw herself back. He had to hold onto her by one leg as he grabbed her with his other arm. T.L.W. was shaken and startled but did not "yell out and scream in pain." He said that T.L.W. was not injured at that time.

Daniel admitted that the twins had been abused. He further admitted that only Appellant or he could have caused the twins' injuries, but he denied that he caused any of their injuries. He said that the only other person that could have injured the twins "would be [Appellant]." Shortly after the twins' injuries were discovered and they had been removed from Daniel and Appellant's custody, Daniel left a message on Appellant's phone stating that he was sorry and "[t]his is all my fault." Daniel explained that he apologized for their relationship ending and Appellant being upset. He also said he was "[e]xtremely upset to the point of tears" when he learned of the twins' injuries.

Michael Parker, of the Texas Rangers, investigated the twins' injuries. As part of his investigation, he interviewed Daniel. Daniel told Ranger Parker that he was never physically abusive or violent with the twins. Daniel also claimed that he was never physically abusive or violent with M.C. Daniel rejected the notion that M.C. was afraid of him. Daniel said that he loved her and thought she was a wonderful child.

Ranger Parker testified that he learned that Daniel was sometimes alone with the twins and M.C. This situation occurred when Appellant ran errands or walked at the track in the evenings. Ranger Parker also learned that Appellant had told Dr. Smith that she had never left the twins alone with Daniel. Dr. Smith also testified

7

that Appellant had told him she had never left the twins or M.C. alone with Daniel. Ranger Parker testified that either Appellant or Daniel or both Appellant and Daniel were the only people that could have inflicted the twins' injuries. He also thought that Appellant should have noticed the twins' numerous bone fractures.

### III. *Standard of Review*

We review the sufficiency of the evidence under the standard of review in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The trier of fact is the sole judge of the weight and credibility of the evidence. *Brooks*, 323 S.W.3d at 899 (citing *Jackson*, 443 U.S. at 319, 326). A reviewing court may not reevaluate the weight and credibility of the evidence and substitute its own judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). The reviewing court must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

### IV. *Discussion and Analysis*

Appellant first challenges, in her four appeals, the sufficiency of the evidence to support her convictions. In her second issue in each appeal, Appellant argues that the trial court's comment about her "boilerplate" rights, such as her presumption of innocence and her right against self-incrimination, fundamentally harmed her

because it "de-emphasiz[ed]" the importance of those rights. We will address her sufficiency issues first.

### A. Issue One: Sufficiency of the Evidence

Appellant advanced three arguments under her sufficiency challenges. She first argues the evidence indicated "that Appellant alone, Daniel Wright alone, or the two of them in conjunction in all likelihood, caused" the injuries to the children. She claims the jury's finding that Appellant individually caused the injuries was not rational. Appellant concludes that, because the State did not include an instruction on the law of parties in the jury charge, the jury was precluded from finding her guilty of the offenses charged.

### 1. Appellant's First Sufficiency Argument

The grand jury alleged that Appellant was responsible for the injuries to her twins. The State did not assert that Appellant and Daniel jointly caused the twins' injuries. Rather, the State argued that Appellant caused the injuries, and she admitted that she alone could have committed the offenses.

Serious bodily injury is a "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." PENAL § 1.07(a)(46). Injury to a child is a result-oriented offense that requires a mental state that relates not to the specific conduct but to the result of that conduct. *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985). A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. PENAL § 6.03(a) (West 2011). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). In a circumstantial evidence case, it is not necessary that every fact point directly and independently to the

appellant's guilt; it is sufficient if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Testimony from medical experts that "significant force" and a "great deal of force" were used to cause a child's injuries is sufficient evidence to prove intent to cause serious bodily injury. *Morales v. State*, 828 S.W.2d 261, 265 (Tex. App.— Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex. Crim. App. 1993); *see also Sandoval v. State*, No. 14-12-00879-CR, 2014 WL 3870504, at *6 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op., not designated for publication). In addition, a jury may infer intent or knowledge based on the occurrence of a previous similar injury. *See Morgan v. State*, 692 S.W.2d 877, 881–82 (Tex. Crim. App. 1985). Evidence that a defendant was alone with a child when the injury occurred provides an inference that the defendant caused the injuries sustained. *See Nadal v. State*, 348 S.W.3d 304, 315 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Flores v. State*, 102 S.W.3d 328, 335–36 (Tex. App.—Eastland 2003, pet. ref'd). And avoidance of Child Protective Services allows for an inference of actions that constitute knowing activity. *See Sandoval*, 2014 WL 3870504, at *6.

Dr. Dumas agreed that the fractures were caused by a "twisting motion of tremendous force" or a "snapping motion of tremendous force." T.L.W. suffered protracted loss of use of her leg because she did not receive prompt medical attention after she sustained the injury. Dr. Dumas further testified that the twins' injuries occurred at different times with a range from days to more than a month before the X-rays were taken. Appellant was with her twins "24 and 7," while Daniel was rarely, if ever, alone with the twins.

Daniel testified about occasions when Appellant called him to say that she could not care for the children; he would come home to find the twins or M.C.

injured. Cosby testified that Appellant rarely took her twins out in public. When Cosby asked her why, Appellant "said that she felt like she couldn't go in public very often with the kids because CPS was always called." Appellant then went on to acknowledge that she was nervous "[b]ecause the kids have bruises." We also note that M.C. had previously suffered an unexplained broken collarbone and had bruising all over her body. With this evidence and the other evidence we have outlined, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Appellant intentionally or knowingly caused not only bodily injury but also serious bodily injury to both of her twins.

## 2. Appellant's Second Sufficiency Argument

Appellant claims that she could not be expected to know that T.L.W. needed medical care because it took X-rays to discover her injuries. We agree with the State's contention that this argument is without merit in light of our conclusion that the evidence was sufficient to support the finding that Appellant knowingly or intentionally caused bodily injury and serious bodily injury to T.L.W. Dr. Dumas testified that T.L.W.'s right femur had been fractured at least several weeks prior to its discovery and that it had healed with a "permanent angular deformity," due in part to the delay in receiving medical attention. *See Thompson v. State*, 227 S.W.3d 153, 161 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (failure to provide medical care to the child aggravated the injury and hindered recovery).

Cosby testified that, when T.L.W. was six or seven months old, she would cry and appeared to be in pain when someone would touch her leg. Jena Clendenen, Appellant's half-sister testified that T.L.W.'s right leg was not straight; and Ranger Parker said Appellant should have noticed that her babies had as many bone fractures as they did. *See Johnston v. State*, 150 S.W.3d 630, 636 (Tex. App.—Austin 2004, no pet.) (considering as factors the victim's "sickly appearance, distended abdomen,

and inability to hold himself up or hold down food and water" in the days prior to receiving medical care in finding the evidence sufficient to support a conviction for causing serious bodily injury by failure to render care to a child). T.L.W.'s deformity in her leg was apparent without X-rays. Appellant knew or should have known of the extent of T.L.W.'s injuries and of T.L.W.'s need for medical attention. Appellant's failure to provide medical care caused T.L.W. serious bodily injury.

### 3. Appellant's Third Sufficiency Argument

Appellant next argues there is no evidence from a grand jury member to show that the alleged causation by "manner and means unknown to the Grand Jury" was actually unknown. Appellant claims that without a grand jury member to testify about the "manner and means unknown to the Grand Jury," there is insufficient evidence to support Appellant's convictions. Appellant claims that the "manner and means unknown" element is not met because the evidence showed that the injuries were caused by "some sort of twisting" motion.

Appellant cites two cases to support her argument: *Sanchez v. State* and *Malik v. State*. *Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Both cases address jury instruction issues. *Sanchez* involved an indictment that alleged a "manner and means unknown," but evidence adduced at trial narrowed the range of causation theories. *Sanchez*, 376 S.W.3d at 770. *Malik* involved a jury instruction that included a definition concerning the defendant's detention, but that issue was one of evidence and not an element of the offense. *Malik*, 953 S.W.2d at 240. Appellant has not challenged the jury instructions given in this case, and *Sanchez* and *Malik* are inapplicable to the sufficiency issue that has been raised by Appellant.

We have previously explained that the State provided sufficient evidence to convict Appellant of all four offenses. Dr. Dumas testified that the injuries were not

accidental. He also opined that the injuries were caused by "tremendous force" and were likely the result of abuse. But Dr. Dumas could not testify exactly how the injuries occurred. As Appellant outlined in her brief, "No one [at trial] could testify to any degree of medical certainty as to *how* the fracture[s] occurred" (emphasis added). A rational factfinder could have found beyond a reasonable doubt that the manner and means by which Appellant inflicted the injuries to her twins were unknown. Therefore, there was no need for testimony from a member of the grand jury. We overrule Appellant's first issue in each appeal.

*B. Issue Two: Alleged Improper Judicial Comments*

Appellant argues that comments by the trial court about her "boilerplate" rights, such as her presumption of innocence and her right against self-incrimination, fundamentally harmed her because it "de-emphasiz[ed]" the importance of those rights. Most complaints on appeal must be preserved at the trial level by a timely request for relief. *Unkart v. State*, 400 S.W.3d 94, 98 (Tex. Crim. App. 2013). The procedure to preserve error is "(1) to object when it is possible, (2) to request an instruction to disregard if the prejudicial event has occurred, and (3) to move for a mistrial if a party thinks an instruction to disregard was not sufficient." *Id.* at 99 (quoting *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004)) (internal quotation marks omitted). Only if a timely objection *would not have prevented harm* and an instruction to disregard *would not have cured the harm*, may a party then skip those steps and go straight to a request for a mistrial. *Id.*

The trial court informed the parties in this case, outside the presence of the jury, of its intention to read to the jury the unique portion of each separate charge and of its intention to only read the "boilerplate" portion, common to each charge, once. The State's attorney remarked to the trial court, "I believe it's the best practice that the Court reads each jury charge in its entirety[.]" The trial court had an off-

the-record discussion with counsel at the bench without the jury being present and then had the jury brought into the courtroom. The trial judge then read the unique portion of each charge. He stopped at various spots to indicate that he would read the portion of the jury charge common to all the offenses once, at the end.

Prior to reading the portion common to each offense, which the trial court called the "boilerplate" portion, the trial court again had an off-the-record discussion with trial counsel at the bench. The trial court then told the jury:

> I am now going to read to you what we refer to amongst us lawyers as the boilerplate language. It is still very important, but it's the same language in each charge and so I am only going to read it once but it is in each of these charges that you will consider today.

At no point in time did Appellant object. When the State indicated its preference to read each charge in its entirety, a method that would likely have avoided the use of the phrase "boilerplate" entirely, Appellant's counsel said nothing in response. Appellant's counsel never requested an instruction to disregard the comment that referred to "boilerplate" rights. Appellant's counsel also never moved for a mistrial. And, immediately after the use of the term "boilerplate," the trial court implored the jury that Appellant's rights were "still very important" and applied to every single offense charged. The trial court then went on to thoroughly outline and describe Appellant's rights and the State's burden of proof. We conclude that Appellant failed to preserve error because he failed to object when the trial court decided to read the jury charge in the manner described. He also failed to object when the phrase "boilerplate" was mentioned. *See* TEX. R. APP. P. 33.1(a); *Unkart*, 400 S.W.3d at 99. We overrule Appellant's second issue in each appeal.

14

## V. *Conclusion*

We have reviewed the record and hold there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Appellant committed two first-degree felony offenses of causing serious bodily injury to a child.  We also hold there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Appellant committed two third-degree felony offenses of causing bodily injury to a child.  We further hold that Appellant waived any complaint about the comments by the trial court.

## VI. *This Court's Ruling*

We affirm all four judgments of the trial court.


MIKE WILLSON

JUSTICE


September 30, 2015

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

15