**Opinion filed May 31, 2019**



## In The

# Eleventh Court of Appeals

_____

## No. 11-17-00123-CR

_____

### JESSIE BRUMLEY, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 244th District Court**

**Ector County, Texas**

**Trial Court Cause No. C-16-0874-CR**

### M E M O R A N D U M   O P I N I O N

The jury convicted Appellant, Jessie Brumley, of the third-degree felony offense of injury to a child by omission. The trial court assessed Appellant's punishment at confinement for four years. Appellant brings two issues on appeal. In her first issue, Appellant contends that the evidence is legally insufficient to support her conviction. Specifically, Appellant argues that the State failed to present any evidence that Appellant possessed the requisite mental state to commit the

offense. In her second issue, Appellant asserts that she received ineffective assistance of counsel. We affirm.

*Evidence at Trial*

Appellant and Daril Osias[1] are the parents of S.O., the child victim in this case. S.O. was born on July 12, 2015, and weighed six pounds twelve ounces at birth.

Appellant posted a request for baby formula on a Facebook group for mothers in September 2015. Lauren McMullen, a member of the group, saw the post and offered to provide formula to Appellant. When McMullen visited Appellant's trailer to drop off formula, she noticed that S.O. was not moving and that he was "[v]ery small and weak"; S.O. was approximately two and one-half months of age at the time. McMullen testified that S.O.'s appearance and "non-movement" were concerning. After McMullen gave Appellant the formula, McMullen looked through pictures of S.O. on Facebook and noticed that the "skin on his legs w[as] just hanging." McMullen concluded that S.O. "was being underfed" and contacted Child Protective Services (CPS).

Leslie Nolasco, an investigator with the Texas Department of Family and Protective Services, processed McMullen's report. Given the severity of the conditions that McMullen outlined in her report, Nolasco made an unannounced visit to Appellant's trailer on September 27, 2015. While inside, Nolasco found S.O. with skin sagging from the bone, dirt caked on his face, and scabs on both knees. According to Nolasco, S.O. "didn't appear to be healthy at all." Nolasco testified that S.O. was very tiny and looked like a newborn or an infant that was only a couple

---

[1]We note that, in a separate trial, the jury convicted Daril Osias (Appellant's husband and S.O.'s father) of the same offense involved in this appeal. *See Osias v. State*, No. 11-17-00067-CR, 2019 WL 1428852 (Tex. App.—Eastland Mar. 29, 2019, no pet.) (mem. op., not designated for publication). We affirmed Osias's conviction on appeal in that case. *Id.* at *5.

2

of weeks old. Nolasco further testified that the scabbing on S.O.'s knees suggested abuse because S.O. was physically incapable of crawling.

Nolasco testified that Appellant did not appear to be concerned that S.O.'s health was at risk. When Nolasco asked Appellant why S.O. looked so thin, Appellant replied that it was "hereditary." Appellant further explained that S.O. was small because S.O. was "Filipino." According to Nolasco, despite S.O.'s condition, Appellant maintained that there was nothing wrong with S.O.

Moreover, Nolasco testified that, at one point during the visit, S.O. appeared to be crying. However, S.O. did not "make any audible noises, [but] open[ed] his mouth wide and seem[ed] to try." Nolasco explained that, when Appellant attempted to feed S.O., Appellant repeatedly removed the bottle from S.O.'s mouth before he could latch on. Because S.O. did not properly latch on to the bottle, Appellant "just put the bottle down and stopped feeding him." After witnessing this, Nolasco asked Appellant and Osias to take S.O. to the hospital for medical attention. Nolasco testified that Appellant initially displayed confusion as to why medical attention was necessary. Eventually, however, both Appellant and Osias complied and accompanied Nolasco to the hospital with S.O.

At the hospital, Keary Brem, an emergency room nurse, examined S.O. Brem testified that S.O. "was very underweight" and had "flaccid" and "loose" skin. She also noticed that S.O. smelled bad and had a "soiled diaper on." When Brem asked Appellant about S.O.'s condition, Appellant replied that S.O. "had not been eating his formula real well." Brem also noted that S.O. had "dry lips," that his mouth and tongue "were very dry," that he had "abrasions on both knees," and that he was "very pale." When Brem asked Appellant about the abrasions, Appellant said they were "from him crawling, trying to crawl"; however, Brem explained that it was "unusual for [an] 11-week-old to try to crawl." Brem also explained that the soft spots on S.O.'s head "were very sunken, which is a big sign of dehydration." Brem concluded

3

that S.O.'s condition was the result of severe dehydration and not "eating very much."

Dr. Vik Wall, an emergency room physician, also examined S.O. in the emergency room. Dr. Wall testified that S.O.'s size was "way below the growth expectations." Dr. Wall noticed that S.O. was pale and inactive and had "poor muscle tone," that his skin was "hanging," and that he was "all shriveled up from the dehydration." Dr. Wall also explained that S.O. had "abrasions on him that he shouldn't have had," that S.O.'s diaper was "ill-kempt, foul," and that S.O. "was dirty" and in "[p]oor hygiene." Dr. Wall concluded that S.O. was dehydrated and diagnosed S.O. with "malnutrition."

Dr. Wall further explained that, when a child is deprived of food, the body prioritizes the brain and the heart and neglects less important systems in the body. He testified that this leads to a failure in growth, reduction in muscle mass, lack of movement, lack of energy to perform certain tasks (such as the ability to cry), and dehydration. Dr. Wall described S.O.'s condition as "very, very serious" and stated that "immediate intervention" was necessary "to save [S.O.'s] life." Dr. Wall stated that S.O.'s condition was not caused by an infection or disease. He clarified that he did not find any medical reason that explained S.O.'s condition, "other than failure of the parents to feed [S.O.]." Dr. Wall estimated that S.O. needed medical care "at least a week, and maybe two" before that visit. He testified that it was the parents' responsibility to seek medical help as soon as a problem with S.O.'s eating arose. Given S.O.'s condition that day, Dr. Wall opined that S.O. was "suffering."

Additionally, Dr. Wall testified that parents are generally very active, engaging, and protective of their children in the emergency room. He expressed that Appellant did not display such behavior. According to Dr. Wall, Appellant did not speak to him in the emergency room, did not make eye contact, and was not

4

engaging. During this hospital visit, CPS decided to remove S.O. from parental custody.

Dr. Babatunde Jinadu, the pediatrician who examined S.O. at birth and supervised S.O.'s recovery after being removed from parental custody, also concluded that S.O. was undernourished and underweight. Dr. Jinadu testified that S.O.'s weight at his birth and discharge was "normal." However, the next time Dr. Jinadu saw S.O.—approximately three months later—S.O.'s weight had increased by only one pound. Dr. Jinadu explained that normally "a child will double their birth weight at five months and triple their birth weight in a year." Dr. Jinadu expressed that a one-pound weight gain in three months was "alarm[ing]." Dr. Jinadu determined that, other than a "failure to be fed," there was no reason for S.O.'s lack of growth. In fact, after S.O. was removed from parental custody and was properly fed and cared for, S.O. started to gain weight and grow at the normal rate. Dr. Jinadu further concluded that, as a result of malnutrition and neglect, S.O. suffered from "developmental delay" and had not reached some of the milestones a child at his age should have reached.

Deborah Puckett, an investigator with the Ector County Sheriff's Office, conducted a criminal investigation of Appellant. As part of her investigation, Investigator Puckett reviewed the medical records of Dr. Jose B. Benigno, S.O.'s former pediatrician. The medical records showed that Dr. Benigno examined S.O. on August 31, 2015. During the appointment, Appellant reported to Dr. Benigno that S.O. weighed five pounds twelve ounces at birth. According to the medical records, S.O. weighed six pounds one ounce at the appointment. However, S.O.'s actual birth weight was six pounds twelve ounces. Thus, the medical records incorrectly showed a seven-week weight gain rather than a weight loss from S.O.'s birth weight. The medical records did not show any other appointments for S.O.

In addition to obtaining S.O.'s medical records, Investigator Puckett interviewed Appellant. Appellant told Investigator Puckett that the doctors did not tell her that anything was wrong with S.O. Instead, Appellant claimed that S.O.'s condition was normal for Filipino children (S.O.'s father is Filipino). Appellant told Investigator Puckett that she believed that S.O. had a genetic condition because Appellant's husband and her father-in-law were tiny as well. Additionally, Appellant informed Investigator Puckett that S.O. was being fed and "was doing fine."

Appellant also testified at her trial. Appellant testified that she had a legal duty to provide care for S.O. Contrary to Appellant's statements to Nolasco and Investigator Puckett, Appellant admitted that she knew S.O. needed medical care in July 2015, as well as when McMullen saw S.O. in September 2015. In fact, according to Appellant, S.O. should have never been released from the hospital because S.O. had problems eating.

Additionally, Appellant testified that she complied with Dr. Benigno's request to bring S.O. back for a checkup one week after S.O.'s appointment on August 31, 2015. However, Dr. Benigno's medical records did not show that Appellant brought S.O. back for another examination. Moreover, Appellant provided several inconsistent statements about when S.O.'s feeding problems began, when she stopped breastfeeding S.O., whether S.O. was vomiting after eating formula, what caused the abrasions on S.O.'s knees, whether Brem asked Appellant any questions at the hospital, and whether food was available for S.O.

The jury ultimately found Appellant guilty of the offense of injury to a child by omission. The trial court subsequently assessed Appellant's punishment at confinement for four years. This appeal followed.

*Analysis*

In Appellant's first issue, she contends that the evidence was legally insufficient to support her conviction. Specifically, Appellant argues that there is no evidence that she intentionally and knowingly caused bodily injury to S.O. We disagree.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). When we conduct a sufficiency review, we consider all the evidence admitted at trial, as well as improperly admitted pieces of evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Additionally, we defer to the factfinder's role as the sole judge of the witnesses' credibility and of the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

Moreover, in our review of the record, direct and circumstantial evidence are treated equally; "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient

7

to establish guilt." *Clayton*, 235 S.W.3d at 778 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We also note that, even if every fact does not "point directly and independently to the guilt of the accused," the "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt. *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

A person commits the third-degree felony offense of injury to a child by omission if she intentionally or knowingly causes bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a)(3), (f) (West 2019). "Bodily injury" means physical pain, illness, or any impairment of physical condition. *Id.* § 1.07(a)(8) (West Supp. 2018). An omission that causes injury to a child constitutes an offense if the person has care, custody, and control of the child or a legal or statutory duty to act. *Id.* § 22.04(b).

Injury to a child is a result-oriented offense that requires a mental state that relates not to the specific conduct but to the result of that conduct. *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. PENAL § 6.03(a) (West 2011). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

"Proof of a culpable mental state almost invariably depends upon circumstantial evidence." *Montgomery v. State*, 198 S.W.3d 67, 87 (Tex. App.—Fort Worth 2006, pet. ref'd); *Morales v. State*, 828 S.W.2d 261, 263 (Tex. App.—Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex. Crim. App. 1993). A factfinder can infer a culpable mental state from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *See Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). Additionally, the

8

factfinder can infer intent or knowledge from the acts, words, and conduct of the accused. *Id.*

Here, the State charged Appellant by indictment with "intentionally and knowingly" causing "bodily injury to [S.O.], a child 14 years of age or younger, by failing to provide adequate nutrition, physical care, and medical care." As S.O.'s mother, Appellant had a legal duty to feed and care for S.O. *See* PENAL § 22.04(b). However, although Appellant testified that she knew that S.O. needed medical care after S.O. was born because S.O. had trouble eating, Appellant failed to seek immediate medical care. Instead, Appellant waited several weeks before taking S.O. to see the doctor. When Appellant finally brought S.O. to see Dr. Benigno, she provided false information about S.O.'s weight and then failed to return for a subsequent examination. Appellant took S.O. to the emergency room only after CPS intervention approximately one month later.

In the emergency room, S.O. needed immediate, life-saving treatment to survive. S.O. was severely underweight, malnourished, and dehydrated. Dr. Wall testified that S.O. was well below the normal growth rate and was suffering. S.O.'s skin was hanging off his bones, and he barely had any muscles. Dr. Jinadu testified that S.O. gained only one pound in approximately three months. Dr. Jinadu concluded that S.O.'s condition was the result of "a failure to be fed."

Despite S.O.'s condition, Appellant exhibited a lack of concern for S.O.'s well-being in the emergency room. Moreover, Appellant was not forthcoming with either Nolasco or Investigator Puckett and provided numerous inconsistent statements throughout her testimony.

When we consider the evidence admitted at trial in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Appellant intentionally and knowingly caused bodily injury to S.O. by omission. Therefore, we conclude that the evidence was legally sufficient to find

9

Appellant guilty of the offense of injury to a child by omission. We overrule Appellant's first issue.

In Appellant's second issue, she contends that she received ineffective assistance of counsel. We review a claim of ineffective assistance of counsel under the *Strickland* standard, which is a two-part analysis that includes a performance prong and a prejudice prong. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For the performance prong, an appellant must show that her trial counsel's performance was deficient. *Id.* For the prejudice prong, an appellant must show that there is a reasonable probability that the outcome of her trial would have differed but for her trial counsel's errors. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Strickland*, 466 U.S. at 694. A failure to make a showing under either prong of the *Strickland* test defeats a claim of ineffective assistance of counsel. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). Appellate review of a defense counsel's performance is highly deferential, and we presume that counsel's actions fell within the wide range of reasonable and professional assistance. *Strickland*, 466 U.S. at 689; *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Walker v. State*, 406 S.W.3d 590, 594 (Tex. App.—Eastland 2013, pet. ref'd).

To overcome this presumption, an appellant's claim of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). "Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped." *Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). In most cases, a silent record that provides no explanation for a counsel's actions will not overcome the strong presumption of reasonable assistance. *Thompson*, 9 S.W.3d at 813–14. An appellant must overcome the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Hayden v. State*, 155 S.W.3d 640, 648 (Tex. App.—Eastland 2005, pet. ref'd). If trial counsel has not had an opportunity to explain the challenged actions, then we will not conclude that those actions constituted deficient performance unless they were so outrageous that no competent attorney would have engaged in them. *See Goodspeed*, 187 S.W.3d at 392; *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003).

Appellant posits fifteen reasons for why her trial counsel provided ineffective assistance. These reasons include trial counsel's questioning of witnesses and his failure to object to evidence, cross-examine witnesses, sufficiently cross-examine one witness, call certain other witnesses, and move for a directed verdict.[2]

The record, however, is silent as to any potential trial strategy that trial counsel may have employed. Appellant did not assert her claim of ineffective assistance in a motion for new trial; thus, Appellant's trial counsel has not had an opportunity to explain his trial strategy. Therefore, on this record, Appellant has failed to overcome the strong presumption of reasonable assistance. *See Thompson*, 9 S.W.3d at 814.

---

[2]The fifteen reasons include the following: (1) failing to object to the State having S.O. "wave and say hi" to the jury although he did not testify; (2) thanking McMullen on cross-examination for what she did to help S.O.; (3) failing to seek a motion in limine regarding a past CPS call to Appellant's residence; (4) failing to object to Nolasco's testimony about Appellant's lack of concern; (5) failing to sufficiently cross-examine Nolasco about her decision to remove S.O. from parental custody; (6) failing to cross-examine Deputy John Rainey; (7) failing to object to Brem's hearsay testimony about Appellant's statements regarding S.O.'s issues with vomiting formula; (8) failing to object to the introduction of State's Exhibit No. 29 (Investigator Puckett's recorded interview with Appellant) and failing to cross-examine Investigator Puckett; (9) asking Dr. Wall on cross-examination whether Dr. Wall was apprehensive in answering the defense counsel's questions and further asking: "Are you [Dr. Wall] afraid that I'm here to protect people who want to hurt babies?"; (10) failing to file a motion for directed verdict at the close of the State's evidence; (11) failing to successfully respond to the State's relevance objection to a photograph of Appellant's bruised arm allegedly caused by Osias; (12) making a "relevance" objection when a "speculation" objection was warranted and, after the objection was ultimately sustained, failing to ask the trial court to strike the answer or inform the jury to disregard it; (13) permitting the State to call an impeachment witness during rebuttal; (14) failing to make a motion for a directed verdict at the close of the defense's evidence; and (15) failing to call any witness to explain why Appellant stayed in an abusive relationship and how such relationships can hinder a person's decision-making ability.

11

Based on our review of the record, we cannot conclude that Appellant's trial counsel's actions were so outrageous that no competent attorney would have engaged in them. *See Goodspeed*, 187 S.W.3d at 392. Because Appellant failed to meet her burden on the first prong of *Strickland*, we need not consider the requirements of the second prong. *Lopez v. State*, 343 S.W.3d 137, 144 (Tex. Crim. App. 2011). We overrule Appellant's second issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


KEITH STRETCHER

JUSTICE


May 31, 2019

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[3]


Willson, J., not participating.

---

[3]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.